ORIGINAL

NORTHERN DISTRICT OF TEXAS

FILED

SEP 1 3 2023

CLERK, U.S. DISTRICT COURT
By _____ KAF
Deputy

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF TEXAS**

|  |  |
|---|---|
| David Adrian Smith | § |
| Plaintiff (*Pro Se*), | § |
|  | § |
| v. | § |
|  | § |
| WWE, Inc, et al, | § |
| Defendants. | § |
|  | § |

Case No.: __322-CV-01580__

### PLAINTIFF'S RESPONSE TO MAGISTRATE JUDGE'S INITIAL FINDINGS.

The Magistrate Judge in their initial findings stated that: 1.) Plaintiff failed to state "factual content intended to show that a trade secret existed;" 2.) Plaintiff's "conclusory allegations as to the existence of a trade secret…lack facial plausibility;" 3.) Had Plaintiff "alleged enough factual detail to allow the court to infer that the (information) he disclosed in 2016 'derives independent economic value (etc.),' Smith still fails to allege that he took reasonable steps to safeguard this information;" 4.) "Disclosing alleged trade secrets to apparent strangers through an apparently unsolicited email, asking that (Defendants Carol Riddick and Frank Riddick) 'keep it under your hats (etc.)' is not within the universe of reasonable safeguards outlined in other cases from this district;" 5.) And "for the reasons set out above, Smith's RICO claim predicated on section 1832 also fails because Smith has not alleged the theft of a 'trade secret'." Due to these points, the Magistrate Judge recommended dismissal by the District Court.

#### Failure to State Factual Content Showing the Existence of Trade Secrets

Plaintiff must apologize to the court for failure to submit any evidence with the Original Complaint. This defect in Plaintiff's pleadings was inadvertent and due to a misinterpretation of

the Texas state privilege of a trade secret owner to not submit trade secrets as evidence. Federal rules hold that the forum state's practices in this area will be the rule in the federal district court. Thus, Plaintiff elected to not submit evidence, believing that to be the meaning of the underlying rules.

This defect may be cured by submission of evidence for the Court's consideration as part of an Amended Complaint. Plaintiff now prays the Court grant leave for them to submit a Motion to Amend and an Amended Complaint including evidence (attached) to establish the plausibility of Plaintiff's allegations. An Amended Complaint will also contain: Dismissal of all charges and counts for Misappropriation of Trade Secrets in favor of charges for the same in the State suit in Dallas County (state dismissal presently under appeal for failure to grant Plaintiff leave to submit Amended Complaint); dismissal of all counts and charges against Alpha Entertainment, LLC and Legendary Field Exhibitions, LLC under the stay provisions of federal bankruptcy statutes; further development of existing allegations of Theft of Trade Secrets and RICO violations. Plaintiff believes that the presentation herein of evidence to be included in an Amended Pleading illustrates the plausibility of their allegations, thus deserving a grant of leave to submit Motion and Amended Complaint.

Plaintiff now submits substantial evidence for the Court's consideration to illustrate what an Amended Complaint would resemble. Plaintiff recognizes that the rules of civil procedure and rules of evidence require that this evidence must be submitted in the pleadings. Plaintiff only submits this evidence and the included timeline now to illustrate its veracity and plausibility of Plaintiff's pleadings for this Court to complete its initial review and commits to submit as part of the Amended Complaint.

In Plaintiff's observation, the definition of what constitutes a trade secret in statutory

language is perhaps the most liberally defined, constructed, construed and interpreted term defined in this area of the law, so long as "(A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." (18 USC 1839(3)). Plaintiff discusses the measures taken to maintain their information's secrecy and the value of the alleged trade secret information below.

19 USC 201.6(a)(1) of CFR further defines "confidential business information," where DTSA is somewhat bland, stating, "Confidential business information is information which concerns or relates to the trade secrets...operations...or other information of commercial value, the disclosure of which is likely to have the effect of...causing substantial harm to the competitive position of the person...from which the information was obtained." Plaintiff alleges that the information they disclosed to Defendant Carol Riddick meets the definition of "confidential business information" in CFR: The information in question concerns or relates to trade secrets including proposed operations of a conceptual startup spring football league; a compilation of information involving characteristics and opportunities present and not being pursued in the marketplace at the time (examples follow); and, individually, listing and describing cities with stadiums fitting to host a minor league football team, opportunities to develop smartphone apps including gambling and fan engagement or fantasy football apps, opportunities to raise startup funds from cities with certain characteristics; and "other information of commercial value, the disclosure of which is likely to have the effect of...causing substantial harm to the competitive position of the person...from which the information was obtained."

Plaintiff has assembled over 83 pages of evidence. These include: 12 emails between Plaintiff and Defendant Carol Riddick; several SEC Form 8-K filings by WWE, Inc.; Delaware Secretary of State filings establishing Alpha Entertainment, LLC (dba XFL 2020), Legendary Field Exhibitions, LLC (dba AAF), and Alpha Acquico, LLC (dba XFL 2023); numerous articles from multiple media outlets discussing specific aspects of events allegedly relevant to the facts of this matter; and a timeline of dates and relevant events included in this evidence.

Three inarguable facts are established by this timeline: 1.) Communications took place between Plaintiff and Carol Riddick which included disclosure of Plaintiff's alleged confidential trade secret information to Carol Riddick; 2.) Prior to Plaintiff's disclosure of trade secret information to Carol Riddick and explicit authorization to share that information further with Defendant Frank Riddick, not only did none of the named Defendants have any momentum towards spring football, but in the four years preceding Plaintiff's disclosure to Carol Riddick, no other persons showed any momentum towards spring football; 3.) In quick succession following Plaintiff's disclosure to Carol Riddick, not one but four separate companies were founded that have successfully launched spring football leagues, all of which trace their inspiration, in whole or in part, directly or indirectly, to Plaintiff's confidential trade secret information.

In addition to the individual alleged trade secrets (ex: smartphone apps, list of cities and stadiums, attributes of potential developmental league) listed in Plaintiff's Original Complaint, the totality of the information presented as well as the overall opportunity and concept as presented by Plaintiff to Carol Riddick are best defined as a "compilation" of these individual market opportunities. The term "compilation" is included in the definition of a trade secret under 18 USC § 1839(3).

Plaintiff in their disclosures to Carol Riddick discussed both the characteristics of cities

and stadiums ideal for use in a minor league spring football league as well as specific cities and

stadiums exhibiting these characteristics. It should be noted that there was no overlap between

the AAF (2019) and the XFL (2020) cities and stadiums, and of the cities and stadiums utilized

in these two leagues, there was very little overlap with the original XFL (2001) cities and

stadiums. This indicates that Plaintiff's analysis of the market opportunities present at time of

disclosure was accurate and held significant value. It also illustrates that the 2001 XFL held

completely different strategic purposes when compared to the opportunities identified by

Plaintiff in their trade secret information and the businesses formed to pursue spring football in

the form of the AAF and 2020 XFL. These specific cities and stadiums Plaintiff discussed

would constitute a "list of potential vendors" as listed in the definition of a trade secret. Then

there was the discussion of opportunities presented by smartphone apps including gambling apps

and fan engagement or fantasy football apps. The significant value represented by the

smartphone gambling and fan engagement apps are discussed at length in the attached evidence

as well as below.

**Conclusory Allegations as to the Existence of Trade Secrets Lack Facial Plausibility**

The previous section discusses this adequately. Plaintiff erred in their interpretation of

the privilege of a trade secret owner to not be required to submit trade secrets into evidence as

meaning that no evidence need be submitted. Plaintiff admits this error, provides evidence to the

District Court for consideration in this motion for extra time and pledges to submit evidence into

the record under rules of civil procedure and rules of evidence in an Amended Complaint, and

apologizes to the Court for their error.

**Factual Detail / Information Derives Independent Economic Value**

As a simple illustration of the significant value this information held in Plaintiff's

disclosure, it should be noted that Defendant MGM Resorts International Operations, Inc. and its

gambling app, playMGM (later betMGM), do not even list smartphone gambling apps in the

"reference" section of its Wikipedia profile page until May 10, 2017—a full year after Plaintiff's

disclosures to Carol Riddick (p. 35-36, attachments). The AAF was renowned after its collapse

for founder and Defendant Charlie Ebersol's pursuit of gambling apps as an integral part of its

business model—so much so that Defendant MGM Resorts International Operations, Inc.

invested in the development of the AAF's gambling app from the start. And during the AAF's

bankruptcy proceedings, MGM acquired this technology and rolled it into its betMGM gambling

app, which is still in use and operating including producing significant revenues for that

company. Charlie Ebersol announced the launch of the AAF in March 2018 and its smartphone

gambling app technology sold in bankruptcy in 2019. MGM announced that betMGM was

expected to have revenues in excess of $1.2 Billion in 2022 and show a profit in 2023. The

value of smartphone gambling apps was presented by Plaintiff—conceptually—in their emails to

Defendant Carol Riddick. Plaintiff has alleged that Frank Riddick conveyed this information to

their fellow WWE, Inc. Board Member, Defendant Vince McMahon. One article in the evidence

states that Defendant Vince McMahon's XFL was considering incorporating gambling apps (pp.

43-45, attachments). And McMahon conveyed this information to Defendant Charlie Ebersol

during the production of Defendant ESPN, Inc.'s '*30-for-30*' episode, '*This was the XFL*.'

Charlie Ebersol saw the value the concept of a gambling app held, bought into it completely, and

went to great expense to develop what MGM then acquired. The topic of smartphone gambling

apps is explored at length in both the timeline and the constituent evidence to be presented. In

fact, the value of the gambling app by itself could be greater than the entire spring football league concept.

Plaintiff further alleged in the Original Complaint that Defendant Carol Riddick and Defendant Frank Riddick conveyed Plaintiff's confidential trade secret information to Defendant Vince McMahon, who subsequently invested over $250 million into the launch of Alpha Entertainment, LLC (dba XFL) (see multiple SEC Form 8-K's filed by WWE, Inc. as presented in evidence). Plaintiff further alleged in their Original Complaint that Vince McMahon subsequently conveyed Plaintiff's information to Charlie Ebersol, et al, who recruited the investment of Reggie Fowler, Tom Dundon and MGM Resorts International Operations, Inc., in excess of $70 million (figure is equal to the amount invested by Dundon per media articles included in evidence). Separately, McMahon conveyed Plaintiff's information to Alpha Acquico, LLC (dba XFL), who recruited investment to-date in excess of $100 million with further significant commitments (figure is an estimate based on media articles presented in evidence).

In total, Plaintiff's information, originally disclosed to Carol Riddick, has led to the launch of four football leagues with total investment in excess of an estimated $500 million and a smartphone gambling app expected to now be profitable with in excess of $1 Billion in annual revenues. Assets and business ventures are typically valued at multiple times the amount of capital invested in their launch. The amount of capital committed to and revenues and profits generated by entities launched based in whole or in part on Plaintiff's confidential business and trade secret information establishes that Plaintiff's information held significant value.

Lastly, despite his venture ending in bankruptcy, Vince McMahon's XFL assets sold in bankruptcy court to the startup group with Alpha Acquico, LLC, who in turn continued the XFL.

The XFL sold for $15 million in bankruptcy. Sale of assets in bankruptcy typically occurs at a significant discount to market value, hence the term "fire sale." Thus, it is reasonable to expect that McMahon's XFL enjoyed a market value of between $60 million and $120 million. Plaintiff is seeking $15 million in judgement plus double that, or $30 million, based on the price McMahon's XFL sold for in bankruptcy.

Therefore, Plaintiff's evidence and factual information present a plausible and significant value of their confidential business and trade secret information disclosed in confidence to Carol Riddick.

Plaintiff has discovered during the preparation of this motion and response that Defendant Charlie Ebersol formed a new venture subsequent to the failure and bankruptcy of Legendary Field Exhibitions, LLC (dba AAF). This venture was formed soon after the dissolution of the AAF by its former executives and select staff to continue pursuing the proprietary technologies being pursued by the AAF in the form of fan engagement and gambling apps for smartphones. Thus, this venture, Tempus Ex Machina, presents both value considerations in this action as well as, potentially, potential claim action by Defendant MGM Resorts International Operations, Inc. against the company and its principals for additional misappropriation, theft and violations of the acquisition of technologies from the AAF by MGM during bankruptcy proceedings. The fact that Charlie Ebersol elected to risk subsequent legal action by pursuing development of associated technologies post-bankruptcy, and the fact the resulting company has partnered with and is providing services to the National Football League (NFL), further illustrates the significant value held by Plaintiff's original trade secret information in total as well as its constituent pieces. (p. 95-100, attachments)

**Plaintiff Failed to Allege Sufficient Safeguards Taken to Protect Information**

Defendant Carol Riddick agreed to receive Plaintiff's information regarding a "professional athletics-related" business opportunity in their text message exchange and was "looking forward to" receiving this information. Carol Riddick and Frank Riddick had the opportunity to wave off receipt of this information during these text exchanges. They did not.

Then Plaintiff disclosed their initial round of information in their first email and attachment, including the admonishment to "keep it under your hats," a common idiomatic expression akin to "keep it confidential." Again, Defendants Riddick and Riddick could have waved off this expectation, could have stated that they were deleting Plaintiff's communications and could have stated no interest in discussing further. They did none of these. In fact, Carol Riddick mentions 1.) discussing the opportunity with Frank Riddick while traveling, 2.) asked questions of Plaintiff in multiple emails, 3.) stated that the overall concept (and specific aspects of it) held some potential, and 4.) mentioned Defendant Scott Jackson by description with specificity as well as saying that Plaintiff may want to discuss the opportunity with Jackson, then a subordinate of Frank Riddick's at their employer in Houston. So, Plaintiff presented their alleged trade secrets to Carol Riddick, Plaintiff admonished Carol Riddick and Frank Riddick to maintain confidentiality, Carol Riddick did not object to this expectation and engaged in conversation willingly, including further disclosure to and including Frank Riddick in the conversation, and while Plaintiff never offered their explicit authorization to either Riddick to disclose their information to any other person, entity or company, Carol Riddick and / or Frank Riddick proceeded to do so in violation of Plaintiff's directions.

As established in *Bailey v. West*, a constructive contract may occur if: 1.) There exists a benefit conferred upon defendant by plaintiff, 2.) Appreciation by defendant of such benefit, 3.)

Acceptance and retention by defendant of such benefit under such circumstances that it would be inequitable to retain the benefit without payment of the value thereof. Defendants Carol Riddick and Frank Riddick obviously held some degree of appreciation for Plaintiff's information, given they conveyed it to Scott Jackson, a former NFL Offensive Lineman and Frank Riddick's subordinate at the time, and further conveyed this valuable information to Vince McMahon. Evidence now submitted in the form of additional SEC Form 8-K's filed by WWE, Inc. shows that Frank Riddick was subsequently hired by the company as, at various times, interim CFO, CFO, CAO and President with a significant compensation package. This demands inquiry into whether there were any agreements between Frank Riddick, Vince McMahon and WWE, Inc. at the time of the Riddicks' conveyance of Plaintiff's trade secret information to McMahon for "quid pro quo" or "future consideration." In addition, the statement in these SEC filings that "Mr. Riddick has no family relationships with any director or executive officer of the Company, and there are no arrangements or understandings with any person pursuant to which he was selected as an officer of the Company" begs clarification from the company. A reasonable person could conclude that an unwritten agreement of "future consideration" was established at the time of the Riddicks' conveyance of Plaintiff's information to McMahon and, at a minimum, WWE, Inc.'s SEC report's statement to the contrary (Frank Riddick had no prior "agreements" before being hired as CFO, CAO, President) requires clarification. The existence of such an agreement, combined with the compensation package received by Frank Riddick, further establish the value of Plaintiff's information as well as the conspiracy to violate Plaintiff's property by Carol Riddick and Frank Riddick with Vince McMahon, and subsequently the other named Defendants.

**Disclosure to Strangers / Unsolicited Email / "Keep it under your hats" / Safeguards**

In the business world, it is not uncommon that opportunities for new business ventures are presented by founders to potential business partners and investors who are complete strangers. So, the Magistrate Judge's finding that Plaintiff disclosed their alleged confidential trade secret information to apparent strangers is neither pertinent nor out of the ordinary. There is, after all, neither mention of any requirement that disclosures be made only to those whom a trade secret owner has known for a long period of time, nor would it be of benefit to commerce or innovation that disclosures be made only between founders and potential business partners or investors with long histories. The mention of long history of affiliation is only mentioned in case law as a consideration in establishing a duty or obligation of confidentiality—a consideration that is neither a requirement (as is the case here due to the establishment of an implied contract) nor is it present in every investment opportunity ever considered in the business environment. Imagine how many investments would be delayed if that were even an immutable business practice much less present in either statutory or case law. The matter of the affiliation of Plaintiff with Carol Riddick and Frank Riddick is only pertinent and was only addressed by the Magistrate Judge because the Court is dealing with an IFP pro se Plaintiff inexperienced at legal pleadings. Had Plaintiff included all text and email communications between Plaintiff and Carol Riddick in their Original Complaint, and had Plaintiff pleaded that an implied contract was established in these communications, the Magistrate Judge would not have needed to address this topic at all. Thus, Plaintiff's evidence being provided for the Court's consideration (recognizing that this same evidence must be submitted as a part of an Amended Complaint) should suffice to dispense with the notion that disclosure was made to apparent strangers. The practice is not uncommon in business and all disclosures were made in confidence as the Court will plainly see.

Plaintiff Googled Defendant Frank Riddick prior to initial contact and saw that he was a member of the Board of Directors of Defendant WWE, Inc. Remembering that WWE's predecessor, WWF, had partnered with NBC Sports in the 2001 version of the XFL and the fact that Plaintiff was pursuing a similar venture in 2016, Plaintiff resolved to follow-up and seek an audience with Frank Riddick to seek the feedback mentioned in the Original Complaint—what WWF / WWE had learned from its failed XFL venture and how it would do it differently if they tried it again. However, Plaintiff did not discuss the "spring football" concept with Carol Riddick or Frank Riddick in their initial in-person communications. This assertion is backed up in the text messages presented by Plaintiff in the included evidence where Plaintiff refers to the concept to be presented as "professional athletics-related," not spring football-related (p. 9, attachments).

Defendant Carol Riddick was Plaintiff's primary contact. Following their initial meeting, Plaintiff followed up with a text message asking for Carol Riddick's email address to forward information to be shared with Frank Riddick. Carol Riddick stated that she was "looking forward to" receiving it (p. 9, attachments). So, Plaintiff's disclosure to Carol Riddick and, by extension, Frank Riddick, was not entirely "unsolicited," in the Magistrate Judge's terminology. At the least, it was not disclosed with no notice and Carol Riddick expressed receptiveness and interest. This aspect of communications between the parties did not come through and the Court did not notice or acknowledge it due to Plaintiff not entering evidence of these communications into the record, for which Plaintiff apologizes to the Court and pledges to submit significant evidence with an Amended Complaint.

Plaintiff's "keep it under your hats" charge amounts to delivering terms of a confidentiality or nondisclosure agreement. And while no written, signed agreement was in

place, such an agreement would serve as a binding agreement enforceable under contract law. As the Court is aware, the language of the Defense of Trade Secrets Act at the federal level and the Uniform Trade Secrets Acts of the several states fails to mention, require, specify, or state preference for an NDA, NCNDA, MOU or LOI between parties for remedy to be sought in trade secrets disputes—either misappropriation or theft. And case law establishes that all the elements of a binding, implied contract may be exhibited in the actions between the parties in such disputes. All these elements are present in the interactions of the Plaintiff with Defendant Carol Riddick and, by extension, and by Carol Riddick's own words, Defendant Frank Riddick. Plaintiff simultaneous to disclosure issues the charge to the Defendants to maintain confidentiality without setting a time frame for its applicability. Defendants, through Carol Riddick's direct communications, discuss freely and are granted the opportunity to fully grasp the extent and the economic value of Plaintiff's trade secrets in the form of the compilation of business, market and strategic opportunities present in the market. Neither Carol Riddick nor, apparently, Frank Riddick take exception to the receipt of Plaintiff's information nor Plaintiff's admonition to maintain confidentiality. And neither Defendant expresses exception to or modification of Plaintiff's admonition of confidentiality. Then, following the close of communications between the parties, Carol Riddick and Frank Riddick convert Plaintiff's trade secret information to their own possession and convey the same to Scott Jackson and, separately, to Vince McMahon. Plaintiff was never remunerated for the value of their trade secret information. Plaintiff alleges that an implied contract in the form of a nondisclosure agreement or confidentiality agreement was established between Plaintiff and Carol Riddick and, by extension, Frank Riddick, based on the actions and behavior of the parties. And that this implied contract mandating confidentiality was subsequently violated by the Riddicks in the conveyance

of Plaintiff's trade secret information to Scott Jackson and Vince McMahon without Plaintiff's explicit authorization. The explicit authorization of the trade secret owner is a stated requirement in both statute and case law and was never offered in any of these alleged conveyances or receipts.

The Magistrate Judge states that Plaintiff has not alleged that they took adequate steps to establish safeguards to protect their alleged trade secret information. Again, the Court arrived at this conclusion since Plaintiff offered no evidence in their Original Complaint and Plaintiff has apologized for this oversight and pledges to cure this defect in an Amended Complaint. Plaintiff now answers the Magistrate Judge's initial finding that Plaintiff did not take adequate steps to protect the confidentiality of their information. By establishing an implied contract between Plaintiff and Carol Riddick and, by extension, Frank Riddick, Plaintiff established a nondisclosure agreement or confidentiality agreement by the actions of the Riddicks that the Court may recognize by the elements. And by establishing this implied contract confidentiality agreement, Plaintiff took actions recognized as adequate to protect their confidential trade secret information. And by subsequently violating the terms of such an agreement in their subsequent actions by conveying Plaintiff's trade secret information to Scott Jackson and Vince McMahon, their actions in violation of the terms of said agreement may be recognized by the Court. This is the start of Plaintiff's allegations: That Plaintiff disclosed confidential trade secret information in confidence to Carol Riddick and, by extension and by mention by Carol Riddick, Frank Riddick; that Carol Riddick and Frank Riddick accepted Plaintiff's information and agreed to maintain confidentiality via an implied contract; and that Carol Riddick and Frank Riddick subsequently violated this confidence, committed Theft by Conversion, conveying Plaintiff's information and in doing so committed Theft of Trade Secrets.

"The subject of a trade secret must be secret, and must not be of public knowledge or of a general knowledge in the trade or business." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 475 (1974), quoting *B. F. Goodrich Co. v. Wohlgemuth, supra*, at 499, 192 N.E.2d at 104; *National Tube Co. v. Eastern Tube Co.*, 3 Ohio C.C.R. (n.s.) 459, 462 (1902), aff'd, 69 Ohio St. 560, 70 N.E. 1127 (1903). Again, at the time that Plaintiff made disclosures to Carol Riddick, there was no entity actively providing spring football to the public, nor had such an entity operated since 2012. In addition, the four spring football leagues that have operated since Plaintiff's disclosures all trace their models in whole or in part to Plaintiff's disclosures. Thus, at the time of Plaintiff's disclosures, the opportunities present in the market may have been known to some, but none have pursued those opportunities except tracing their origins to Plaintiff's confidential trade secret information.

### RICO Claim Fails / Theft of Trade Secret not Sufficiently Alleged

"This necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secret to another 'in confidence, and under an implied obligation not to use or disclose it.'" *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 475 (1974), quoting *Cincinnati Bell Foundry Co. v. Dodds*, 10 Ohio Dec. Reprint 154, 156, 19 Weekly L. Bull. 84 (Super. Ct. 1887). Plaintiff's email language to Carol Riddick speaks plainly—disclosure occurred only for the purpose of discussion of the opportunities presented; Plaintiff stated an expectation that Carol Riddick and, by extension Frank Riddick, maintain confidentiality; the Riddicks' actions established an implied contract confidentiality agreement; and Plaintiff established not an implied expectation of confidentiality but an explicit expectation of confidentiality that the Riddicks subsequently violated. The terms "disclosure" and "use" are the terms of civil

misappropriation of trade secrets. Plaintiff herein states their intent to dismiss all charges and counts of Misappropriation in an amended complaint. However, Plaintiff, in continuing to pursue charges of Theft of Trade Secrets as predicate acts activating civil RICO charges asserts that the corresponding terms "conveyed" and "received" alleged in the Original Complaint apply in this matter.

"The protection accorded the trade secret holder is against the disclosure or unauthorized use of the trade secret by those to whom the secret has been confided under the express or implied restriction of nondisclosure or nonuse. The law also protects the holder of a trade secret against disclosure or use when the knowledge is gained not by the owner's volition, but by some 'improper means,' Restatement of Torts § 757(a), which may include theft, wiretapping, or even aerial reconnaissance. A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is, by starting with the known product and working backward to divine the process which aided in its development or manufacture." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 475, 476 (1974). Granted, *Kewanee* was handed down prior to the institution of the UTSA or DTSA. However, the principles of that case were based on various Restatements of the Law and were codified in those later statutes. The important takeaway being that Plaintiff's statement of "keep it under your hats" constitutes an "express or implied restriction of nondisclosure or nonuse." And as discussed elsewhere, Carol Riddick receives this admonition from Plaintiff, accepts Plaintiff's alleged trade secret information, discusses it freely, refers to Frank Riddick as a participant in the discussion multiple times, thus establishing the elements of an implied contract that this Court may identify. Further, the issues of "fair and honest means," "independent invention," and "so-called reverse engineering" are not before the Court because

Plaintiff has alleged the only reason the four football leagues and smartphone app were launched was due to Plaintiff disclosing their confidential trade secret information to Carol Riddick, disclosed further with Plaintiff's explicit authorization to Frank Riddick, then converted by the Riddicks to their own possession and subsequent conveyance to others. None of the named Defendants may claim "reverse engineering" without first acknowledging receipt of Plaintiff's information through one source or another, acknowledgement of which defeats such claims. None may claim "independent invention" where none exists. And, thus, none may claim "fair and honest means" where only improper means were utilized.

"The word 'property,' as applied to trademarks and trade secrets, is an unanalyzed expression of certain secondary consequences of the primary fact that the law makes some rudimentary requirements of good faith. Whether the plaintiffs have any valuable secret or not, the defendant knows the facts, whatever they are, through a special confidence that he accepted. The property may be denied, but the confidence cannot be. Therefore, the starting point for the present matter is not property or due process of law, but that the defendant stood in confidential relations with the plaintiffs, or one of them. These have given place to hostility, and the first thing to be made sure of is that the defendant shall not fraudulently abuse the trust reposed in him. It is the usual incident of confidential relations. If there is any disadvantage in the fact that he knew the plaintiffs' secrets, he must take the burden with the good." *E. I. Du Pont de Nemours Powder Co. v. Masland*, 244 U.S. 102 (1917). Plaintiff emphasizes that disclosure to Carol Riddick occurred in confidence and that the actions of Carol Riddick and, by extension and by her reference, Frank Riddick constitute an implied agreement of confidentiality identifiable by the Court by the elements. The Defendants' subsequent actions violated this implied agreement, conveying Plaintiff's trade secret information to others. The Riddicks' knowledge of Plaintiff's

trade secret information reposed in them a duty to maintain this confidence that their conveyance of Plaintiff's trade secret information to others violated, injuring Plaintiff.

The Magistrate Judge concluded that since Plaintiff did not sufficiently allege that Misappropriation of Trade Secrets occurred, Plaintiff also did not sufficiently allege that Theft of Trade Secrets occurred, thus, the Predicate Acts of Theft not being alleged, Plaintiff's RICO claims failed by extension. Again, this conclusion was reached since Plaintiff erred by not submitting any evidence. Plaintiff now provides evidence to the Court for the purpose of its initial review of an IFP complaint. The combination of text and email communications (and attachments) between Plaintiff and Carol Riddick establish that disclosure occurred in confidence (by means of an implied contract confidentiality agreement). The Court should note that Plaintiff succeeded in establishing an implied agreement which carries the full weight and obligations of an express or signed agreement. The Delaware Secretary of State records show the dates of filing of the parent entities of the AAF, XFL (2020) and XFL (2023). The SEC Form 8-K filings by WWE, Inc. establish that Vince McMahon sold company shares to fund a new venture, Alpha Entertainment, LLC, to pursue spring football through the relaunch of the XFL. The dates of the disclosures by Plaintiff, the wrap in production by ESPN, Inc. of its '30-for-30' television program and its broadcast, the formation of Alpha Entertainment, LLC (dba XFL) by McMahon (p. 37, attachments), the SEC Form 8-K filings by WWE, Inc. (pp. 38-39, 56-57, 72-73, attachments), and dates related to the formation and launch of Legendary Field Exhibitions, LLC (dba AAF) by Charlie Ebersol, taken together, establish a plausible scenario pleaded by Plaintiff in the Original Complaint. Thus, Plaintiff has achieved the standard of plausibility meriting consideration of the opportunity to submit an Amended Complaint, unless the Court demands evidence that Plaintiff does not yet have access to. ("[T]here are certain types

of cases that will be almost impossible to bring, as all of the information necessary to state a
plausible claim is owned or known by the defendants and not accessible to the plaintiffs until the
discovery phase." CHARLES A. WRIGHT ET AL., 5 FEDERAL PRACTICE & PROCEDURE
§ 1216 (3d ed.) (2018)).

"A court generally gives a plaintiff at least one chance to amend under Rule 15(a)." See
*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)
("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies
before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise
the court that they are unwilling or unable to amend in a manner that will avoid dismissal.").
Plaintiff's amended complaint will cure the defects including: Failure to introduce evidence;
dismissal of misappropriation charges in favor of misappropriation charges in Texas state suit;
dismissal of Alpha Entertainment, LLC and Legendary Field Exhibitions, LLC under the
provisions of US bankruptcy statutes; and adding additional details to the original complaint
including a more thorough pleading of personal jurisdiction against all remaining Defendants.

## CONCLUSION

Plaintiff now approaches the Court and enters the concurrently filed Motion to Allow
Extra Time to Respond to the findings of the Magistrate Judge in their initial review. Granting
extra time allows the Court to consider Plaintiff's response to the Magistrate Judge's initial
findings and recommendations, herein. The purpose of Plaintiff's response is to secure grant of
leave to submit Motion to Amend and an Amended Complaint for the Court's consideration.
Plaintiff prays the Court grants the accompanying motion for additional time and the
forthcoming motion to submit an Amended Complaint.

Dated:  August 23, 2023                   Respectfully Submitted,

By:   */s/  DavidAdrianSmith*
        DAVID ADRIAN SMITH, *Pro Se*
        3917 CLUBWAY LN
        FARMERS BRANCH, TX 75244
        P: 214-235-9215
        davidadriansmith@hotmail.com

        ***PRO SE* PLAINTIFF**

## CERTIFICATE OF SERVICE

Plaintiff has not served the Motion for Extra Time or the Response to Magistrate Judge's initial findings on any counselor for any Defendant as the Court has not served any files on any Defendant.  The Court is still performing its initial review of an IFP complaint, thus Plaintiff is only responding to the Court at this time.

## Timeline of Events

**Date**              **Page – Attachment**

n/a                   1-5 – Timeline of Events

June 27, 2014         6-7 – Defendant Canadian Football League and Defendant ESPN, Inc. agree to broadcast all CFL games on the company's platforms.

March 26, 2016        8 – Plaintiff David Smith sends a text message to Defendant Carol Riddick, stating, "I…am following up on our conversation." (in person) "If you will reply to this text with your email address I will forward some more information for Mr. Riddick."   Note: Plaintiff did not discuss in person details of their trade secret information or the nature of the underlying business opportunity being spring football, only that they desired to speak with Defendant Frank Riddick further.

May 9, 2016           9 – Second text exchange between Plaintiff and Defendant Carol Riddick.   Note: Text establishes that Defendant was expecting Plaintiff's email and was "looking forward" to receiving it.

May 10, 2016          10-13 – Plaintiff David Smith sends first email (including attachments) to Defendant Carol Riddick including permission to share information with her husband, Defendant Frank Riddick, but for them both to "keep it under your hats," or maintain confidentiality.

May 16, 2016          14-15 – WWE, Inc files form 8-K with SEC announcing that Vince McMahon's family trust sold shares of WWE, Inc stock for "diversification"; no mention of XFL, spring football or Alpha Entertainment, LLC are made in the filing.

May 18, 2016          16-25 – Plaintiff David Smith and Defendant Carol Riddick exchange multiple emails; Riddick makes no objection to Smith's "keep it under your hats," appearing to agree to that requirement by acquiescence and making reference to her husband, Defendant Frank Riddick having questions, thus establishing that Frank Riddick had received Plaintiff's trade secret information.

June 2, 2016          26-27 – Plaintiff David Smith and Defendant Carol Riddick's final email exchanges.

May to June 2016      28-30 – Defendants Carol Riddick and Frank Riddick disclose Plaintiff's confidential trade secret information to Scott Jackson; Carol Riddick describes Jackson with enough specificity that Plaintiff was able to identify Jackson via Jackson's LinkedIn profile and company website (Scott Jackson LinkedIn profile).

| | |
|---|---|
| May to June 2016 | Defendants Carol Riddick and Frank Riddick disclose Plaintiff's confidential trade secret information to Vince McMahon; Vince McMahon separately discloses Plaintiff's confidential trade secret information to Dick Ebersol, Charlie Ebersol and ESPN, Inc; ESPN, Inc agrees to produce and air an episode of its '*30-for-30*' series to be produced by Charlie Ebersol and starring Vince McMahon and Dick Ebersol. |
| November 2016 | Defendant ESPN, Inc wraps production of a television program in which Plaintiff's trade secret information is discussed and broadcast to the public; Defendants Vince McMahon and Dick Ebersol star in and Charlie Ebersol produces the program. |
| February 2, 2017 | 31-34 – ESPN, Inc broadcasts '*30-for-30*' episode, '*This was the XFL.*' (2 articles on episode) |
| February 16, 2017 | As alleged in Vanech v. Ebersol, et al, Robert Vanech and Charlie Ebersol agree to form a new business venture to pursue spring football opportunities. |
| February 21, 2017 | As alleged in Vanech v. Ebersol, et al, Robert Vanech texts Charlie Ebersol "concerning the role fantasy / gaming would play in the league." |
| March 27, 2017 | As alleged in Vanech v. Ebersol, et al, a draft business proposal for the AAF is created by Vanech. |
| May 10, 2017 | 35-36 – Article on playMGM, predecessor entity of betMGM, Defendant MGM Resorts International Operations, Inc.'s online smart phone gambling app (first mention of smartphone gambling apps on MGM's Wikipedia page under references). |
| May 18, 2017 | As alleged in Vanech v. Ebersol, et al, Defendants Vince McMahon, Dick Ebersol and Charlie Ebersol meet to discuss WWE, Inc licensing or selling name and other properties of the XFL to what would become Legendary Field Exhibitions, LLC (dba AAF); no agreement was reached; either at this meeting or subsequently, it became apparent that McMahon was pursuing spring football separately and the two ventures would be competing. |
| July 5, 2017 | As alleged in Vanech v. Ebersol, et al, Robert Vanech by this date is entirely written out of the new AAF venture. |

September 6, 2017    37 – Alpha Entertainment, LLC formed in Delaware to pursue spring football; the new league announces that play will commence in spring 2020, two full years out.

December 21, 2017    38-39 – WWE, Inc files form 8-K with SEC announcing that Vince McMahon has sold shares in WWE, Inc to fund Alpha Entertainment, LLC to pursue spring football and XFL.

January 25, 2018    40-41 – Defendant Vince McMahon announces to the public his intentions to pursue a spring football league by relaunching the XFL.

January 25, 2018    42 – Plaintiff's email to Defendant Carol Riddick asking if either Carol Riddick or Frank Riddick had any connection to Defendant Vince McMahon or the newly announced XFL (Defendant has never responded to this email).

January 30, 2018    43-45 – Article stating that Defendant Vince McMahon and the 2020 XFL are considering utilizing smartphone gambling apps and fan engagement / fantasy football apps. (2 pages)

February 2, 2018    46 – Legendary Field Exhibitions, LLC formed in Delaware to pursue spring football; the new league announces that play will commence in spring 2019, one full year prior to the XFL's announced launch.

March 20, 2018    47 – Article stating Legendary Field Exhibitions, LLC and Defendant Charlie Ebersol announce the launch of the AAF for 2018.

May 14, 2018    48 – US Supreme Court strikes down PASPA and federal ban on states allowing sports gambling, opening the door for further development of online and smartphone gambling apps.

May 24, 2018    49-50 – CFL announces that ESPN, Inc. will broadcast all games of the 2018 season within the US.

Sept. 11, 2018    51-53 – Article stating that the AAF has partnered with Defendant MGM RIO, Inc. to develop smartphone gambling app.

February 2019    Legendary Field Exhibitions, LLC (dba AAF) begins playing games in its inaugural season.

February 2019    54-55 – Legendary Field Exhibitions, LLC (dba AAF) secures investment commitments from Defendant Tom Dundon up to $250 million; Dundon assumes complete ownership of AAF and full operational authority.

March 27, 2019     56-57 – WWE, Inc files form 8-K with SEC announcing that Vince McMahon has sold shares in WWE, Inc to fund Alpha Entertainment, LLC to pursue spring football and XFL.

April 2019     Defendant Tom Dundon shuts down the AAF and files bankruptcy under Legendary Field Exhibitions, LLC.

April 2019     58-59 – Article about the history of the AAF.

May1, 2019     60-67 – Article recounting the AAF's true nature as a tech startup.

August 2019     68-69 – Article stating that Defendant MGM RIO, Inc. had acquired the smartphone gambling app technologies from the AAF in its bankruptcy proceedings.

October 2019     70-71 – Article stating that Yahoo Sports had entered a partnership with Defendant MGM's smartphone gambling app, betMGM.

February 2020     Alpha Entertainment, LLC (dba XFL) begins playing games in its inaugural season.

March 24, 2020     72-73 – WWE, Inc files form 8-K with SEC announcing that Vince McMahon has sold shares in WWE, Inc; funds were used to fund ongoing operations of Alpha Entertainment, LLC and the XFL.

April 14, 2020     74-75 – Article recounting history of failed football leagues. (Note: Timeline presented establishes that there was no spring football at the time of Plaintiff's disclosure to Defendant Carol Riddick in May 2016, and that there had been no spring football for several years.)

July 7, 2020     76 – Alpha Acquico, LLC formed in Delaware to acquire the assets of Alpha Entertainment, LLC in the latter entity's bankruptcy proceedings.

August 3, 2020     77-78 – Alpha Entertainement, LLC sells the assets of the XFL to Alpha Acquico, LLC in bankruptcy for $15 million.

October 1, 2020     79 – Plaintiff's letter to Defendant Redbird Capital Partners, LLC seeking audience with Defendant Gerry Cardinale.

March 10, 2021     80 – Article stating that Defendant Canadian Football League discusses potential merger, two-league championship game and other mutual business with Defendant Alpha Acquico, LLC (dba XFL).

4

July 7, 2021         81 – Defendant Alpha Acquico, LLC (dba XFL) and Defendant
                     Canadian Football League table talks to pursue mutual business.

July 25, 2021        82 – Defendant Dwayne Johnson tweets that Defendant Alpha
                     Acquico, LLC (dba XFL) is moving its headquarters to Arlington,
                     Texas and the former Ballpark in Arlington.

November 5, 2021     83-85 – Defendant WWE, Inc. files SEC form 8-K announcing
                     Defendant Frank Riddick's hire as CFO / CAO and departure from
                     the company's Board of Directors.

February 2022        The "new USFL" football league begins its first season, electing to
                     play games and operate from one location and hold television-only
                     (no fans in the stands) games; the predecessor legal entity of the
                     USFL did business with Alpha Entertainment, LLC (dba XFL) and
                     Vince McMahon during the operations of the XFL in 2020.

June 8, 2022         86-87 – Defendant Canadian Football League announces that all
                     games in 2022 season will be broadcast in US on the platforms of
                     Defendant ESPN, Inc.

August 31, 2022      88-94 – Defendant WWE, Inc. files SEC Form 8-K announcing the
                     promotion of Defendant Frank Riddick to the position of President
                     and continuing as the company's CFO.

February 2, 2023     The "new XFL" begins play in Arlington, Texas; founders / owners /
                     investors Dwayne Johnson, Dany Garcia and Gerry Cardinale (of
                     Redbird Capital Partners, LLC) appear on the field during the game,
                     broadcasted by Defendant ESPN, Inc., to discuss the new venture.

February 6, 2023     95-99, 100-X – Sports Business Journal articles discusses Tempus
                     Ex Machina and Charlie Ebersol's continued development of the
                     AAF technologies after disposition of the tech assets of the AAF
                     during bankruptcy proceedings; also, the company's partnership with
                     the NFL (Plaintiff discovered on August 1, 2023; first article states
                     the company was previously very private but the NFL had partnered
                     with the company shortly after the bankruptcy of the AAF and had
                     committed to acquire a 15% stake in the tech company prior to the
                     AAF's bankruptcy).

June 27, 2014 – Defendant Canadian Football League and Defendant ESPN, Inc. agree that all CFL games will be broadcast on the company's platforms (2 pages)

https://espnpressroom.com/us/press-releases/2014/06/espn-secures-exclusive-u-s-rights-to-canadian-football-league-games/

ESPN Secures Exclusive U.S. Rights to Canadian Football League Games
Derek Volner, June 27, 2014

86 Games on ESPN Networks in 2014 as Part of Multi-Year Agreement ESPN has acquired exclusive rights in the United States to Canadian Football League (CFL) games through a multi-year agreement, beginning with the 2014 season. ESPN will present at least 86 games in 2014 with 17 or more contests to be televised on ESPN, ESPN2 and ESPNEWS, including the 102nd Grey Cup. An additional 69 games will be carried on ESPN's live multi-screen sports network, ESPN3.

The TV schedule kicks off Saturday, June 28, at 3 p.m. ET on ESPN2 when the Calgary Stampeders host the Montreal Alouettes, whose star wide receiver is Duron Carter, son of ESPN NFL analyst and Pro Football Hall of Famer Cris Carter. Canada's Sports Leader TSN will work with ESPN on game productions and their team of commentators will call the games.

ESPN's relationship with the CFL spans more than three decades. In 1980, ESPN televised its rst live football telecast ever – the CFL's Toronto Argonauts vs. Montreal Alouettes – and continued televising CFL games from 1980-84, 1986-89, 1994-97 and in 2013. Additionally, ESPN3 has carried CFL games since 2008, including 54 games in 2013.

"Since the early days of ESPN, CFL games have been a valued part of our programming lineup," said Burke Magnus, Senior Vice President, Programming Acquisitions. "I'm proud to see our relationship continue as we strive to serve football fans 365 days a year."

"We are thrilled for our fans in the United States that the ESPN networks will be the exclusive home of our league there," said Mark Cohon, Commissioner of the CFL. "This is a powerful showcase for our talented athletes, our exciting brand of football, and the CFL itself, a league with a proud history but, more importantly, a bright future."

CFL games presented on ESPN networks will also be available to audiences in Latin America, the Caribbean and the Pacic Rim. Further, games on ESPN, ESPN2 and ESPNEWS will be available on WatchESPN for fans with video subscriptions from affiliated providers.

About ESPN3
ESPN3 is ESPN's live multi-screen sports network, a destination that delivers thousands of exclusive sports events annually. It is accessible online at

6

WatchESPN.com, on smartphones and tablets via the WatchESPN app and streamed on televisions through Amazon Fire TV, Apple TV, Chromecast (via the WatchESPN app), Roku, Xbox 360 and Xbox One. The network is currently available to more than 92 million homes at no additional cost to fans who receive their high-speed Internet connection or video subscription from an aliated service provider. The network is also available at no cost to approximately 21 million U.S. college students and U.S.-based military personnel via computers, smartphones and tablets connected to on-campus educational and on-base military broadband and Wi-Fi networks.

March 26, 2016 – First text exchange between Plaintiff and Defendant Carol Riddick



——— Saturday, March 26, 2016 ———

> Mrs. Riddick, this is David Smith, I just drove you home from the airport and am following up on our conversation. If you will reply to this text with your email address I will forward some more information for Mr Riddick. Thank you very much!
>
> 6:47 PM

Hi David - thank you for such a pleasant ride. My E is 
9:17 PM

> Oh, Doctor Riddick--I'll remember that! Tty soon.
>
> 9:53 PM

8

May 9, 2016 – Second text exchange between Plaintiff and Defendant Carol Riddick



**Carol Riddick**
2146417714

9:17 PM

> Oh, Doctor Riddick--I'll remember that! Tty soon.
>
> 9:53 PM

Monday, May 9, 2016

> Dr. Riddick, this is David Smith. I drove you home a while back. I will be putting that one-page overview together for you and Mr. Riddick to consider. Professional Athletics related. Talk to you soon.
>
> 5:32 PM

Tuesday, May 10, 2016



hi David, I remember! looking forward to it Carol

8:52 AM

Enter message

9

May 10, 2016 – Plaintiff's first email to Defendant Carol Riddick

David Smith from <company redacted> with concept for consideration

David Smith <email redacted>
Tue 5/10/2016 4:07 PM
To: Carol Riddick <email redacted>

1 attachments (16 KB) Minor League Football Riddick Letter 20160509.docx;

Dr. Riddick,

I made two versions of the concept. One in a one-page, more "bullet point" concept form. One in letter form. Both in one attached Word file. Feel free to share with Mr. Riddick but please keep under your hats for now until we can confer and you either tell me it has no merit, you aren't interested--or we discuss how to move forward with the concept.

Again, I heard this discussed on sports talk radio recently, so others at least have a similar concept in mind. Thank you for your consideration and I look forward to speaking with you further.

Sincerely,
David Smith
<email redacted>
<phone number redacted>

May 10, 2016 – Attachment to Plaintiff's first email to Defendant Carol Riddick (3 pages)

Dr. Carol Riddick
Frank Riddick III
<address redacted>

Tuesday, May 10, 2016

Dear Dr. and Mr. Riddick,

I spoke with Dr. Riddick on March 26th while driving her home from the airport. The topic was a concept of mine and Mr. Riddick's relevant experience. I must apologize for the nature of my description as neither of you are under an NCNDA and Mr. Riddick's experience and network will undoubtedly show my trepidation to share details. So I proceed with caution and a sense of trust I hope you will not violate.

Further, I have left <company redacted> and am working for a candidate running for the <public office redacted>. My concept, stated simply, is to launch a sort of "Minor League Football" league whose primary purpose is to develop players for the NFL, specifically quarterbacks, but also other position players. The purpose is not to compete with either the NFL or the NCAA's, but to provide a role the NCAA's are not fulfilling and which could assist in providing an even more entertaining product in the premier professional football league, the NFL.

This league could function very much like minor league baseball does in regards to the associated professional league, MLB. Where the minor league teams are typically not owned by the same entities which own the MLB teams, there are contractual relations between specific MLB and minor league teams, including A "rookie teams," AA and AAA level teams. The purpose is to take college and high school baseball players from their respective academic levels to the Major League level. The concept for this football league would be similar.

The secondary purpose of this league, which would start with around 8 teams and grow from there, would be to provide tier two cities (250,000-500,000?) with professional football, most likely in the spring and early summer so as to not compete with the existing NFL schedule. It provides immense opportunities for cross-marketing NFL events in the off season such as the NFL Draft, the off week before the Super Bowl, the start of free agency, etc.

The purpose of this league would not be to win championships but to develop players for the NFL, both on the way up as well as to "fill in" for injuries in the NFL. The additional benefit would be providing an environment to development future NFL executives and coaching staff in a professional environment where mistakes can be made and learned from in a more forgiving environment than the NFL.

Further, I would like to explore the possibility of partnering with television networks not currently broadcasting NFL games. These are to include Univision, Telemundo and BET. This would

11

provide these minor networks the incentive to step up their broadcasting capabilities similar to what Fox did prior to and after beginning broadcasting NFL games in c. 1994.

I look forward to speaking with you both and receiving your questions and constructive critique of the concept and how it might be brought to fruition. I am open to all suggestions. I have already begun discussing at the conceptual stage with contacts in the <reference redacted> media and a <school redacted> classmate of mine is the former <role and employer redacted> so I am confident that I will be able to open discussions with the three entities listed herein.

Thank you for your willingness to consider and discuss further. I look forward to speaking with you soon!

Sincerely,

David Adrian Smith
<email redacted>
<phone number redacted>

12

Concept:        Founding and operating a "Minor League Football" league
Purpose:        1.) To develop players, coaches and management for promotion to the NFL
                2.) To provide football viewing opportunities during the traditional "off season"
                3.) To expand pro football <redacted>

Narrative:

The problem is simple: The NCAA's are simply not set up to develop players to be NFL-ready upon entering the NFL Draft. Elite NCAA coaches and programs are set up to win, win, win—their compensation and fundraising are set up to demand a winning product. And non-elite NCAA teams are more or less there to provide "wins" for the elite programs with an occasional prospect making it to the pros.

The problem is particularly evident in the number of elite quarterbacks present in the NFL. Despite the number of NCAA quarterbacks present, the vast majority of these are not fit for pro ball. And the turnover in NFL head coaches belies the need for a professional development league which affords the ability for aspiring head coaches to hone their craft as well.

There was recently a discussion on <reference redacted> about this exact issue in which a comment was made that, "With all the billionaires in DFW you would think one of them would see the need for this and the opportunity it presents." This discussion took place well after I had begun developing my concept for the same.

The purpose of this proposal is not to compete with either the NCAA's or the NFL. Those two entities already serve specific purposes and are well-entrenched and established. However, neither truly addresses the need for a developmental league which is charged with developing talent for the NFL.  Further, there are many, many more metropolitan regions of the country that could support a minor league football team with a more limited schedule that simply cannot, either due to sparse population, level of economic development present and other factors, support an NFL franchise. <redacted> are among the markets which could support a minor league football team with lower operating budget and ticket prices geared towards developing players for the NFL and playing in the current off season (spring / early summer).

Proposal:

<strategy redacted on teams / games>
First year budget of approximately <redacted>
<schedule redacted>
<finances redacted>
- Prefer doing business with networks <redacted>
- <media outlets redacted>

13

May 16, 2016 – Defendant WWE, Inc.'s SEC Form 8-K filing of sale of common stock by the irrevocable trust of Defendant Vince McMahon (2 pages)

8-K 1 a8k.htm

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K CURRENT REPORT Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): May 16, 2016

World Wrestling Entertainment, Inc.
(Exact name of registrant as specified in its charter)

Delaware 001-16131 04-2693383
(State or other jurisdiction (Commission File Number) (IRS Employer of incorporation) Identification No.)

1241 East Main Street, Stamford, CT 06902
(Address of principal executive offices) (Zip code)

Registrant's telephone number, including area code: (203) 352-8600

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2.):
☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))
Item 8.01. Other Events.

On May 16, 2016, the Vincent K. McMahon 2013 Irrev. Trust U/A dtd. December 5, 2013 (the "GRAT") sold 2,191,894 shares of Class A common stock of World Wrestling Entertainment, Inc. (the "Company") in a block trade made in accordance with the provisions of Rule 144 of the Securities Act of 1933, as amended. The GRAT was established by Vincent K. McMahon ("Mr. McMahon"), the Company's Chairman and Chief Executive Officer, for estate planning purposes for the benefit of Mr. McMahon and certain members of Mr. McMahon's family. The GRAT sale was executed for

14

liquidity and asset diversification. After the sale, the GRAT continues to own 1,547,372 shares of the Company's Class B common stock. The GRAT may, at any time, subject to compliance with applicable securities laws, dispose of some or all of its remaining shares of the Company's common stock depending on various factors, including, but not limited to, the price of the shares of the Company's Class A common stock, the terms and conditions of the transaction and prevailing market conditions, as well as liquidity, family planning and diversification objectives. Other than possible additional sales by the GRAT, Mr. McMahon informed the Company that he has no current plans to sell any shares of the Company's stock and that he intends to continue in his capacity as the Company's Chairman and Chief Executive Officer for the foreseeable future.

The 2,191,894 shares sold by the GRAT represent approximately 6% of the Company's outstanding shares of Class A common stock. After the sale, Mr. McMahon beneficially owns 37,080,747 shares of the Company's Class B common stock, which represents approximately 86% of the Company's total voting power and approximately 48.8% of the Company's total outstanding shares of common stock.

### SIGNATURE
Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WORLD WRESTLING ENTERTAINMENT, INC.
By: /s/ George A. Barrios
George A. Barrios
Chief Strategy and Financial Officer

Dated: May 16, 2016

May 18, 2016 – Plaintiff's second email to Defendant Carol Riddick

Re: David Smith from <redacted> with concept for consideration

Wed 5/18/2016 12:29 PM
To: <email redacted>; <email redacted>

Dr. Riddick,

Just following up on my previous email to see if you or Mr Riddick have any feedback at this point.

Thank you once again for your consideration!

David Smith

May 18, 2016 – Defendant Carol Riddick's first email to Plaintiff, in reply to Plaintiff's second email of May 18, 2016

RE: David Smith from <redacted> with concept for consideration

carol riddick <email redacted>

Wed 5/18/2016 12:41 PM

To: <David Smith email redacted

hi, yes, we have reviewed. I am sorry I did not contact you. Good concept, and also thoughts and questions for you.

I can cover more later, one question for now is how does your plan address the pitfalls that made the XFL unsuccessful?

Carol

May 18, 2016 – Plaintiff's third email to Defendant Carol Riddick, in response to her first email of May 18, 2016


RE: David Smith from <redacted> with concept for consideration

David Smith <email redacted>
Wed 5/18/2016 12:50 PM
To: carol riddick <email redacted>

Great question which is always one of the first two questions asked. The XFL, as you may remember, was billed as an alternative to the NFL--a competing product. This MLF (minor league football) concept is, rather, being conceived as a supplement to the NFL. Something that, by better preparing players for the NFL will actually help the top league put forward a better overall product.

As I mentioned in my initial email, the concept is not to compete with either the NCAA or NFL. Those are both established products. However, the NCAA's simply don't make player development a priority.  Players develop due to the fact that elite schools are recruiting elite players and the best coaches and players working together simply result in player and coach development. But it is not the NCAA's priority. The University of Alabama and the University of Texas want to WIN!! Period, end of discussion.

And so we have a lack of top-shelf quarterbacks, for one thing. This league will provide a mechanism by which such players can be developed for starting and backup jobs in the NFL.

The XFL failed because it sought to reinvent the wheel—supplant the NFL. That is not my intention. We will want to earn the NFL's trust and assistance. The only thing that survives the demise of the XFL is the nifty "above field" camera technology introduced in it's first game. But the level of play was abysmal and fans want the best level of play before anything else.

Hope that helps, look forward to chatting further,

David Smith

May 18, 2016 – Defendant Carol Riddick's second email to Plaintiff, in response to Plaintiff's third email of May 18, 2016

RE: David Smith from <redacted> with concept for consideration

carol riddick <email redacted>

Wed 5/18/2016 4:28 PM

To: David Smith <email redacted>

HI David - We do understand the development concept vs the being an alternative, but still a question to be considered.

Where is funding coming to create/fund teams? Funding for creating venues? Use of existing?

The "goods" were certainly that there are some top tiers cities currently without teams - that would be easy fits.

Carol

May 18, 2016 – Plaintiff's fourth email to Defendant Carol Riddick, in response to Defendant's second email of May 18, 2016


RE: David Smith from <redacted> with concept for consideration

<David Smith email redacted>
Wed 5/18/2016 5:16 PM
To: <Carol Riddick email redacted>

Yes, St.Louis and San Diego come to mind with regards to the Los Angeles situation. So whatever happens in LA, there are automatically to markets readily available. Salt Lake City, Sacramento and Austin San Antonio also come to mind. Once the teams start initial operations, possibly even before that, we can start marketing season ticket sales. I don't know how the NFL handled expansion into the most recent cities teams (sic) opened up in. But I think that becomes our model as well. First, is there an existing Stadium available. Second, can pledges for 10 or 20000 season tickets be secured within next time. That brings a deposit and secures a team for any given City. I would think for the first season it would be wise to have only 8 teams. Scarcity is our Ally in that case. Make it something only a few cities have and make them compete with the others who wants a team. We can always add 8 more cities in year 2. And it wouldn't be bad to skip over a city or two in Year One if we think we can get a better deal from them in year 2.

I have some potential sources for small investors and obviously I would like to minimize the amount of the deal I have to give away. I would rather have more investors receiving a larger total chunk of the pie then fewer investors receiving the same junk. Easier to retain a piece of equity as well as management and/or influence in operations now and in the future. Any suggestions for introductions to investors are appreciated.

I may have also mentioned before that I have made initial inquiries with minor media Outlets regarding broadcast rights which is obviously where the majority of revenues will come from. You undoubtedly remember the impact broadcasting NFL games had four Fox beginning in 1994. I believe Outlets like Telemundo, Univision and BET will see tremendous opportunity 2 carry these games, making their existing programming and operations that much more viable. That said, I'm not willing to pass over the major outlets if that is the only way to ensure the success of the league.

I know that's a lot of information. Sorry it's a little of both. And I still need to gather all of this into an executive summary or business plan format including some rudimentary financial figures.

David

20

May 18, 2016 – Plaintiff's fifth email to Defendant Carol Riddick, further thoughts after Plaintiff's fourth email of May 18, 2016

RE: David Smith from <redacted> with concept for consideration

<David Smith email redacted>
Wed 5/18/2016 5:21 PM
To: <Carol Riddick email redacted>

Another consideration, which you sort of alluded to, is that there are enough second and third-tier Metro areas large enough to support a minor league type team that might like to have such a thing in two to three years but cannot bid on it initially because they cannot compete with the likes of <redacted>, etcetera. And if you have a league with 32 teams in five or even ten years you're talking about a very successful, stand alone product as well as investment in its own right.

It wouldn't even hurt at that point to split up the teams into an upper Division and lower division, perhaps a rookie league, just so that you have more "champions." After all, everyone loves being number 1 and having defeated the other guys! And politicians understand this concept as well.

David

May 18, 2016 – Plaintiff's sixth email to Defendant Carol Riddick, following Plaintiff's
fifth email of May 18, 2016 (2 pages)

RE: David Smith from Premier with concept for consideration

David Smith <email redacted>
Wed 5/18/2016 8:48 PM
To: carol riddick <email redacted>

In reviewing your first question, I don't believe that I answered how my concept addresses the
failures of the XFL. Did my narrative address your point sufficiently? The XFL and it's failure
were forefront in my addressing the opportunity present. My foremost intent is to provide a sort of
a "quarterback incubator" for QB's that have either been drafted and are on the way up as well as
guys who have "flunked out" once, maybe they weren't ready?

The goal / plan will eventually be to pair up one MLF team with each NFL franchise. This will
also allow NFL teams to stock up on players at all positions. So again, player development as
opposed to championship trophies. Supplementing the product rather than supplanting it.

As far as television is concerned, Telemundo, Univision and BET already have programming and
audiences. If they can bring sufficient dollars to the table for broadcast rights, the incentive is there
for them to "up their game" as did Fox with NFL broadcasts in c. 1994. (Long-term, think of what
having 3 incremental bidders for NFL games could do to NFL TV bidding)

And then there is the political / financial impact of approaching the 64 (-ish) top non-NFL markets
and soliciting bids from them for bids. If a $100,000 non-refundable deposit is required to enter a
bid, that is a potential $3.2 million nest egg if only 32 submit bids. Remember, too, this will provide
an opportunity for NFL players on the way out to transition into coaching or broadcasting or play
an extra couple of seasons. Having these "names" on the field will draw ratings and sell tickets,
even if only 5-10% more than would a "rookie league." The XFL, by comparison, tried to pass off
an inferior product as equal to the NFL.

Perhaps more technology could be deployed to put the armchair quarterback in a position, too, to
better understand the role of the QB in the game? There is also the "fantasy football" phenomenon
which has become its own pursuit among armchair QB's. If the fantasy experience is a central tenet
of this league that is a potential source of interest as well as revenues (i.e. Tony Romo's fantasy
league...partnership opportunity?)

Also, since the point is player (and coach) development, and since I'm planning on this being a
spring-into-early-summer league, it may be possible to incorporate NFL team personnel on
coaching staffs as well as having current players working out with MLF teams to give MLF players
the opportunity to hone their skills, etc.

22

Again, none of this is possible with a competing entity. All of it is possible with a partnership / symbiotic relationship. I hope that addresses the failure of the XFL and how to avoid their pitfalls in this concept.

The NFL can still improve its product. But there is no reason to do so by offering an alternative. David

May 18, 2016 – Defendant Carol Riddick's third email to Plaintiff, in response to Plaintiff's sixth email of May 18, 2016

RE: David Smith from <redacted> with concept for consideration

carol riddick <email redacted>
Wed 5/18/2016 9:15 PM
To: David Smith <email redacted>

nice expansion/explanation of material
the concept sounds very good - even better if all the pieces come together
we will have more time to read through this weekend and will share further
thoughts should they be helpful

Carol

May 18, 2016 – Plaintiff's seventh email to Defendant Carol Riddick, in response to their third email of May 18, 2016

RE: David Smith from <redacted> with concept for consideration

<David Smith email redacted>
Wed 5/18/2016 9:33 PM
To: <Carol Riddick email redacted>

Fantastic. I'll look forward to receiving your further comments. Thank you for your time and attention!
David

June 2, 2016 – Plaintiff's eighth email to Defendant Carol Riddick, in follow-up to the email exchange of May 18, 2016

My little brainstorm!

<David Smith email redacted>
Thu 6/2/2016 8:48 PM
To: carol riddick <email redacted>

Dr Riddick,

I have befriended a former NFL player and am discussing other business with him at present but have let him know I would like to discuss this concept with him in the near future. I see select current and recent NFL players as potential early investors in the concept. I would be interested in knowing your thoughts on that concept. I would also like to continue our discussion or Q&A regarding the concept at your leisure. Would you be able to make some time, possibly with Mr Riddick as well, to discuss in person?

I think between NFL players and potential City forking over a non-refundable deposit the concept has sufficient legs to at least start crawling. Your thoughts?

David Smith

June 2, 2016 – Defendant Carol Riddick's fourth email to Plaintiff, in response to Plaintiff's eighth email of June 2, 2016

RE: My little brainstorm!

carol riddick <email redacted>
Thu 6/2/2016 8:56 PM
To: <David Smith email redacted>

HI David - Thank you for contact. We poured over your Emails while traveling last week.
Mr. R has a former NFL player, business school at UVA, then BCG consultant ---that now works for him /a really great guy, who he thought you might wish to get input from.
So, that's one thought.
The Big Q that kept coming up with Mr.R is...."What is the business/economic model" for your idea. it is not clear in your initial discussions.
Nutshell is...Like the positive potential, but also many questions.

Carol

June 2, 2016 – Defendant Scott Jackson's LinkedIn profile, in reference to Defendant Carol Riddick's description of Defendant Frank Riddick's colleague in their email of June 2, 2016 (3 pages)



28

## Defendant Scott Jackson LinkedIn profile (2/3)



## Defendant Scott Jackson LinkedIn profile (3/3)



This Was the XFL
Episode aired Feb 2, 2017
Vince McMahon in 30 for 30 (2009)

A bold challenge, a fearless experiment and ultimately, a spectacular failure. In 2001, sports entertainment titans Ebersol and McMahon launched the XFL. It was hardly the first time a league had tried to compete with the NFL, but the brash audacity of the bid, combined with the personalities and charisma of Ebersol and McMahon and the marketing behemoths of their res... Read all

| | |
|---|---|
| Director: | Charlie Ebersol |
| Stars: | Vince McMahon, Bob Costas, Dick Ebersol |
| Top cast (including): | Dwayne Johnson |

A bold challenge, a fearless experiment and ultimately, a spectacular failure. In 2001, sports entertainment titans Ebersol and McMahon launched the XFL. It was hardly the first time a league had tried to compete with the NFL, but the brash audacity of the bid, combined with the personalities and charisma of Ebersol and McMahon and the marketing behemoths of their respective companies - NBC and WWE - captured headlines and a sense of undeniable anticipation about what was to come. Bringing together a cast of characters ranging from the boardrooms of General Electric to the practice fields of Las Vegas, "This Was the XFL" is the tale of - yes - all that went wrong, but also, how the XFL ended up influencing the way professional team sports are broadcast today. And at the center of it all - a decades long friendship between one of the most significant television executives in media history and the one-of-a-kind WWE impresario. This film will explore how Ebersol and McMahon brought the XFL to life, and why they had to let it go.

February 2, 2017 – Article about ESPN's '*30-for-30*' episode, '*This was the XFL*.' (Note Charlie Ebersol's comments on page 3: Author's comments about the XFL possibly being relaunched (paragraph 1); Charlie Ebersol recounting Jerry Jones stating, "The NFL desperately needs a developmental league" (paragraph 2); Ebersol's analysis of Jimmy Garofolo, Tom Brady and Bob Kraft (paragraph 3)) (3 pages)


Director Charlie Ebersol Talks 'This Was the XFL' 30 for 30, Vince McMahon, More
TOM CLARK
FEBRUARY 2, 2017

Charlie Ebersol is bringing the story of the XFL to the masses.

The ESPN 30 for 30 documentary This Was the XFL tells the tale of WWE chairman Vince McMahon and former head of NBC Sports Dick Ebersol's foray into the world of professional football. The XFL began in 2001 and promised an old-school style of football with a modern twist.

But the league did not live up to the hype. Sloppy games, harsh criticism and a string of bad luck brought the XFL to an end after just one season.

The documentary premieres almost 16 years to the day of the XFL's opening kickoff and looks back at the events that led to the league's downfall. In an interview with Bleacher Report, Ebersol talked about the film, including the pressures of interviewing his father Dick, as well as McMahon.

"My memory of the XFL was how much fun it was and how zany and how out of this world the whole experience was," he said. "I knew [making the film] was going to be crazy. But then the other side of it...interviewing my father and Vince—my dad is quite literally my father and Vince a father figure to me—was absolutely terrifying."

Ebersol also talked about setting some ground rules for the project before filming began. Those included not only getting the best out of both his father and McMahon but keeping them in line as well.

"It was funny because when I first approached my dad and Vince, it was a lot of 'if Vince says yes, I'll say yes—if Dick says yes, I'll say yes,'" he recalled. "And when they both finally said yes, I said you have to understand two things. One, I need your promise that you are going to be totally open with me. But secondarily, that you understand that you are going to have no creative control over this, that this is my film.

"I want to tell this story as accurately and as straightforward and as fun as possible while at the same time not falling prey to the charms of Vince McMahon and my father."

McMahon's charms, as well as his legendary self-confidence as the head of pro wrestling's biggest company, were also a topic of discussion. That confidence took

32

McMahon to the top of his industry and toppled WWE's chief rival, WCW. McMahon's belief in his ability to overcome any obstacle in his way played a big factor in the XFL's development.

"Promotion after promotion crumbled under the weight of what Vince was doing," Ebersol said. "WWE didn't just get big. He went and he conquered each of those regions one at a time. And he did so ruthlessly, and it was built on the back of having a vision.

"For the XFL, for all that's said about them not really having a full understanding of what they were trying to do, Vince clearly saw the need for someone to come in and offer a type of football that was more reminiscent of the old way and less corporately driven. And I think those initial numbers that first weekend proved that thesis out. I do think his confidence is not misplaced."

McMahon's vision was there, but the execution was perhaps not what it could have been. Much of the criticism surrounding the XFL was the game itself, which left a lot to be desired. Ebersol spoke on the league's football operations and the impact it had on the way the XFL was not only delivered but received.

"The football operations were people who were very concerned with their careers and what they were going to be able to get out of being in the NFL in the future," he said. "And so they weren't willing to take risks. The L.A. team won the championship because [head coach] Al Luginbill understood football operations enough that he [knew] how to utilize the best parts of the new playbook.

"So I think if they built the league today, they'd hire someone like an Al Luginbill to build the football side of it, and they would be much better off. But the football operations in the past, whether or not it was malicious, is unclear. But at the very least, it can be said that they subverted the success of the league through their inability, their inaction and, probably, ineptitude."

Not only was the game under fire, but so too was the marketing of the XFL. The league paralleled much of what WWE was doing with the Attitude Era, featuring scantily clad cheerleaders, controversial ad campaigns and TV personalities that came straight from Monday Night Raw.

One of the XFL's most ardent critics was NBC sports anchor Bob Costas, whose level of disdain for the league was evident in the documentary. Ebersol spoke of Costas and the veteran broadcaster's take on the failed XFL.

"Bob Costas was a very very big fan of wrestling growing up," he said. "In the '80s, when my dad was doing Saturday Night's Main Event with Vince. Bob was at WrestleMania. He was covering those kinds of things because he loved the idea of good versus evil and the ultimate bad guys and ultimate clean good guys.

33

"But I think he was very upset that the nostalgia that he had for wrestling was gone because of what they had created in the darker period of the late '90s, early 2000s. And he felt a sense of decorum was being lost. And I think that's what came out about the XFL."

Despite every negative aspect of the XFL, from the hype to the content to the gameplay, Ebersol revealed a surprising twist near the end of the documentary. The dinner table scene between Dick and McMahon was unscripted, and that conversation included talk of possibly restarting the league.

"I interviewed [Dallas Cowboys owner] Jerry Jones the morning after WrestleMania, and I sat with Jerry during WrestleMania," Ebersol said. "He had never been to a wrestling event before. He was on his feet cheering when The Rock came out and John Cena and all these other events. In his sit-down interview, I asked him about that, knowing that I was going to interview Vince and my dad. Jerry was like 'look, we desperately need a developmental league in the NFL.'

"The Jimmy Garoppolos of the world really need an opportunity to get snaps so that [New England Patriots owner] Bob Kraft knows whether or not he's ready and willing to be the starting quarterback if anything ever happens to Tom Brady. I think it takes a strength of personality and will to do what Vince did, and you have to be Vince, sort of, to do it."

Whether McMahon will try his hand at pro football again is unknown. WWE demands a lot of time and attention, both of which McMahon has devoted to his company for years. But if he learned from past mistakes and hired the right personnel to oversee operations, perhaps the XFL could be reborn.

Anything can happen in WWE—just as McMahon is capable of anything. Perhaps the story is not over yet.

Ebersol's interview can be heard in its entirety here. This Was the XFL premieres February 2 at 9 p.m. ET on ESPN.

Tom Clark can regularly be seen on Bleacher Report. His podcast, Tom Clark's Main Event, is available on iTunes, Google Play, Amazon Android, Windows Phone and online here.

May 10, 2017 – Article about playMGM, predecessor of betMGM gaming app (2 pages)

MGM Looks To Shake Up An Already-Competitive Nevada Market With New PlayMGM Mobile Sports Betting App
Steve Ruddock, May 10, 2017

Competition in the Nevada mobile sports betting market is a little more fierce following the launch of MGM Resorts International's new mobile sports betting app, said MGM Resorts International Executive Director of Interactive Gaming Development Lovell Walker:

"Our playMGM mobile sports betting app puts our Sports Books at our guests' fingertips. We worked closely with IGT throughout the development process to appropriately leverage PlaySpot technology, ensuring that the app delivers an unrivaled guest experience.

M life Rewards members can enjoy sports wagering opportunities in Nevada from the pool, their hotel rooms or if they are a Nevada resident, from the comfort of their home."

The playMGM app is available on the iOS and Android operating systems.

"PlaySpot brings sports betting forward into the mobile era, delivers unparalleled player experiences and helps MGM Resorts connect with players on an entertainment platform that they use every day," said IGT's Senior Vice President Global Product Marketing, Interactive, Matteo Monteverdi.

US milestones for MGM and IGT
The debut of the playMGM sports betting app in Nevada marks a pair of notable firsts:
- MGM's first mobile sports betting product.
- IGT's first appearance in the US sports betting market.
As such, the playMGM sports betting app has several unique features.

Here's what the playMGM sports betting app has to offer
The playMGM app offers the usual assortment of point spread and money-line bets, as well as:
- In-play wagering
- Prop bets
- Parlay bets
- Futures bets

But what sets the playMGM app apart is a trio of features exclusive to IGT's PlaySpot.
- Digital deposit and withdrawal options
- Trend Cloud – a personalized home screen
- Dynamic parlays – customizable wagering options

Here's a look at each of these features in turn.

Digital deposits and withdrawals worldwide
Like most Nevada sports books with mobile solutions, MGM allows registered playMGM users to deposit and withdraw cash at any of its 10 MGM Resorts Race & Sports Books along the Las Vegas Strip.

But with playMGM, there is also a second way to deposit and withdraw from a sports betting account. The software allows customers to sign up for a playMGM pre-paid card in the app itself. By using this feature, players can fund and withdraw money from their playMGM accounts from anywhere in the world.

This means that visitors who placed bets while in Nevada can collect on winning bets without making a return trip to Las Vegas or having to mail in winning tickets. This also saves locals from having to take a trip to the Las Vegas Strip to collect winnings.

Trend Cloud

The second feature available on the playMGM mobile betting app is Trend Cloud, a personalized home screen.

According to the press release, Trend Cloud is "an innovative home screen that displays a live, personalized selection of the most relevant bets available for each player."

Dynamic parlays

The third exclusive feature IGT is bringing to the Las Vegas sports betting market is the ability to create original parlays, round robins, and teaser combinations with real-time pricing updates.

The playMGM app lets users mix and match different combinations to craft these personalized wagers. As the player is creating the wager, the app will update the potential payout in real-time.

Steve Ruddock has spent years covering the online gambling industry for a variety of publications, including Bluff Magazine and OnlinePokerReport.com. Follow Steve on Twitter – @SteveRuddock

September 6, 2017 – Alpha Entertainment, LLC (dba XFL) filing in Delaware

Entity Details
THIS IS NOT A STATEMENT OF GOOD STANDING

File Number: 6534523
Incorporation Date / Formation Date:      9/6/2017
                                          (mm/dd/yyyy)

Entity Name:          ALPHA ENTERTAINMENT LLC
Entity Kind:          Limited Liability Company

Entity Type:          General
Residency:            Domestic
State:                DELAWARE

REGISTERED AGENT INFORMATION
Name: CORPORATION SERVICE COMPANY
Address: 251 LITTLE FALLS DRIVE
City: WILMINGTON County: New Castle
State: DE Postal Code: 19808
Phone: 302-636-5401

December 21, 2017 – WWE, Inc SEC Form 8-K filing showing sale of common shares by CEO Vince McMahon to fund Alpha Entertainment, LLC to pursue spring football and XFL (2 pages)

8-K 1 a8k.htm

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K
CURRENT REPORT
Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
Date of Report (Date of earliest event reported): August 18, 2016

World Wrestling Entertainment, Inc.
(Exact name of registrant as specified in its charter)

Delaware 001-16131 04-2693383
(State or other jurisdiction (Commission File Number) (IRS Employer of incorporation)
Identification No.)

1241 East Main Street, Stamford, CT 06902
(Address of principal executive offices) (Zip code)

Registrant's telephone number, including area code: (203) 352-8600

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2.):
☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company ad defined in Rule 405 of the Securities Act of 1933 (17 CFR 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR 240.12b-2).
Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Item 8.01. Other Events.

On December 21, 2017, Vincent K. McMahon ("Mr. McMahon"), Chairman and Chief Executive Officer of World Wrestling Entertainment, Inc. (the "Company"), sold 3,340,000 shares of the Company's Class A common stock in a block trade made in accordance with the provisions of Rule 144 of the Securities Act of 1933, as amended. Mr. McMahon executed the sale primarily to fund a separate entity from the Company, Alpha Entertainment LLC, which Mr. McMahon established to explore investment opportunities across the sports and entertainment landscapes, including professional football. Mr. McMahon has informed the Company that he has no current plan to sell additional shares of the Company's stock and that he intends to continue in his capacity as the Company's Chairman and Chief Executive Officer for the foreseeable future.

The shares sold by Mr. McMahon represent approximately 4.3% of the Company's total outstanding shares of Class A and Class B common stock. After the sale, Mr. McMahon beneficially owns 32,193,375 shares of the Company's Class B common stock, which represents approximately 82.8% of the Company's total voting power and approximately 41.8% of the Company's total outstanding shares of common stock.

SIGNATURE
Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WORLD WRESTLING ENTERTAINMENT, INC.
By: /s/ Mark Kowal
Mark Kowal
Chief Accounting Officer and Senior Vice President, Controller
Dated: December 21, 2017

January 25, 2018 – Article announcing the relaunch of the XFL (2 pages)


XFL returns: 'Professional football re-imagined'
A.J. Perez, Published January 25, 2018

World Wrestling Entertainment founder Vince McMahon on Thursday announced the return of the XFL in 2020.

Like the first rendition of the XFL, the league will consist of eight teams that will play games with a two-round playoff. McMahon said the location of the teams, the team names or the precise format of games has not been determined.

"We will present a shorter, faster-paced, family friendly and easier to understand game," McMahon said in a news conference. "Don't get me wrong, it's still football, but it's professional football re-imagined."

McMahon said that the XFL will place teams "where fans want us to go" and added that league was "nowhere near" selecting any of the cities what will be home to franchises. Each franchise will be owned by the league.

The rules in the original XFL didn't include the ability to call a fair catch, leading to massive hits (and injuries). This time around, McMahon said player safety will be a priority.

McMahon didn't come right out and guarantee that players would be required to stand for the national anthem, but said the rules will be made public and players will know the XFL's rules if a mandate to stand during the anthem is included.

"I think, it's a time-honored tradition to stand and appreciate the national anthem for any sport here in America, for that matter in any country," McMahon said. "I think it would be appropriate to do that."

McMahon was given the names of three quarterbacks not currently on NFL rosters and asked if he'd like to see them be part of the XFL: Johnny Manziel, Tim Tebow and Colin Kaepernick.

"We want someone who does not have any criminality associated with them whatsoever. In the XFL, even if you have a DUI, you will not play in the XFL," McMahon said. "If Tim Tebow wants to play, he could very well play."

None of the players listed were arrested for driving under the influence and only one (Manziel) has a known criminal history. Manziel reached an agreement with prosecutors in Texas in 2016 on a misdemeanor domestic assault case. He also pleaded guilty in 2013 in an assault case that stemmed from a bar fight while he was a quarterback at Texas A&M.

40

There wasn't a TV partner announced, although McMahon said games will be available on multiple platforms. WWE announcers will not be used to announce XFL games, McMahon added.

"We intend to have a much faster game," McMahon said. "We are going to try to get to two hours. That's our goal."

The original XFL, a joint venture between WWE and NBC, lasted for one season. That came in 2001, when NBC didn't have NFL broadcast rights. The network acquired those rights as it became the new home of Sunday Night Football starting in the 2006 season.

Like other leagues that have attempted to create an alternative to the NFL, the XFL struggled. The venture lost an estimated $70 million as both ratings and attendance failed to meet expectations. NBC and UPN refused to carry the games in 2002, which led the XFL to shutter operations.

There were eight teams in the original XFL: San Francisco Demons, NY/NJ Hitmen, Orlando Rage, Los Angeles Xtreme, Las Vegas Outlaws, Memphis Maniax, Birmingham Thunderbolts and the Chicago Enforcers. The 10-game regular season and two-round playoffs — that culminated with the Million Dollar Game at the Los Angeles Coliseum — ran from February to April. The Xtreme won the title.

Follow Perez on Twitter @byajperez

January 25, 2018 – Plaintiff's ninth email to Defendant Carol Riddick, in reference to Vince McMahon announcing the relaunch of the XFL for 2020

Re: David Smith from <redacted> with concept for consideration

David Smith <email redacted>
Thu 1/25/2018 6:07 PM
To: carol riddick <email redacted>

https://www.usatoday.com/story/sports/2018/01/25/xfl-returns-wwe-vince-mcmahon/1066633001/

You all aren't involved in this in any capacity, are you? Advisors, etc? If I remember correctly you or Mr. Riddick are closely affiliated with Mr. McMahon, yes?

David Smith

January 30, 2018 – Article stating 2020 XFL is considering gambling and fantasy sports apps (3 pages)

The Rebooted XFL Hints at Fantasy Sports, Sports Betting Potential
Written by Eric Ramsey, Updated on January 30, 2018

Vince McMahon has announced that he's bringing back the XFL.

The independent football league existed briefly in 2001, and it will return for a second season in 2020. Details are sparse so far, but it appears that sports betting and fantasy sports will be part of the XFL's game plan.

The 72-year-old McMahon is best known as the chairman of World Wrestling Entertainment (WWE).

XFL hints at betting, fantasy sports

Prior to McMahon's announcement, Alpha Entertainment broadcasted a short hype video. It seems to indicate where the XFL stands on betting and fantasy sports.

Here's part of the voice-over:

This is gaming and fantasy. This is padded roulette. Make a trade, make a team, make a move, make a bet.

Unfortunately, McMahon didn't field any questions regarding betting or fantasy sports during the Q&A session that followed. But the video says plenty, and the context makes it easy to infer the rest.

Fantasy XFL for fan engagement

The XFL is going to need to take some significant steps to acquire an audience. Lack of interest was the primary reason for the failure of the original league. Despite a network TV deal and a flashy on-field product, it lasted just one season.

Getting anyone to care is going to be the biggest hurdle for the new league, too. The NFL has arguably the largest brand in all of sports, and even it has had some trouble keeping fans interested these days. Two pro football leagues might just be too many.

But as any league commissioner can tell you, fantasy sports is one of the most effective ways to get fans involved. Engaged fans watch games, buy merchandise and keep leagues afloat.

McMahon needs all of those things to be successful. And he realizes that he needs to get the fans on board. "Our approach to presenting games will be multi-platform," he

43

said on Twitter, "which will allow us to engage fans and customize the viewing experience in ways that were unimaginable just a few years ago."

Daily fantasy football didn't exist during the XFL's first run, and it's a tool that McMahon will almost certainly leverage for the revamp.

But what about sports betting?

Betting on the original XFL

When the league first launched in 2001, Las Vegas sportsbooks carried action on XFL games.

As a reminder of how long ago that was, the now-demolished Stardust was the first book to set a line for opening weekend. The maximum bet was just $1,000, a fraction of what they accepted on NFL games.

Still, the books felt confident they were getting a fair product at the time. Nevada sports betting law prohibits betting on events with known outcomes (like the WWE), but the XFL was not scripted. By hanging lines on games, sportsbooks gave the XFL some implicit validation as a legitimate sports league.

The fact that the original XFL had a team in Las Vegas put some additional pressure on bookmakers. And opening week was the same week as the Super Bowl, one of the biggest betting days of the year.

Fans could watch the games on national television, too. McMahon secured a lucrative broadcast/ownership deal with NBC, which put the product in the primetime spotlight. That partnership also gave the sport viability in the eyes of some bookmakers.

"Had it not been on a major network, we would have waited," said Joe Lupo, manager of the Stardust sportsbook.

So far, McMahon hasn't indicated if TV will be part of his broadcast package in 2020. He has divulged plans to pursue more modern distribution channels such as Facebook and Amazon, which carry some weight in the modern day. But, even in this online age, digital broadcasts still don't provide the same visibility as network television does.

That being said, fans are the ones who ultimately decide which games are worth betting on. And they'll bet on pretty much anything they can watch.

Is it fair to worry about XFL integrity?

Professional wrestling, where McMahon originates, isn't exactly known for its sporting integrity. It's an entertainment product with scripted outcomes designed to create artificial drama. There is no system of accountability in place, and outcomes have

44

previously been leaked before events. That makes it off limits for Nevada sportsbooks, which are prohibited from offering WWE action.

It's fair to assume the XFL will use the same entertainment-forward recipe as the WWE. Stats and analytics will take a backseat to action and entertainment. The outcomes may not be scripted, but there certainly won't be an NFL-like attention to rules and enforcement.

So is there any concern about XFL match fixing? Probably not. That's especially true if regulation and legalization of sports betting rolls out in states in the coming years, should the US Supreme Court strike down the federal single-game wagering ban.

Betting on XFL games is likely to be small, which makes it easy to spot potential shenanigans. If bookmakers do have any concerns, they could simply limit the bet amounts.

McMahon did offer that there will be "no crossover whatsoever" in talent or "anything like that" between the WWE and the XFL. But the McMahon mindset will certainly be visible in the XFL's product.

The only surprise on the fantasy and sports betting fronts would be if the XFL doesn't try to leverage the engagement both verticals provide.

Eric Ramsey
Eric is a data and policy analyst covering regulated US gambling, including sports betting and DFS. He comes from a poker background, formerly on staff at PokerNews and the World Poker Tour. Legal Sports Report Copyright © 2023

February 6, 2018 – Legendary Field Exhibitions, LLC (dba AAF) filing in Delaware

Entity Details
THIS IS NOT A STATEMENT OF GOOD STANDING

File Number: 6746095
Incorporation Date / Formation Date:     2/6/2018
                                         (mm/dd/yyyy)

Entity Name:         LEGENDARY FIELD EXHIBITIONS, LLC
Entity Kind:         Limited Liability Company
Entity Type:         General
Residency:           Domestic
State:               DELAWARE

REGISTERED AGENT INFORMATION
Name: THE CORPORATION TRUST COMPANY
Address: CORPORATION TRUST CENTER 1209 ORANGE ST
City: WILMINGTON County: New Castle
State: DE Postal Code: 19801
Phone: 302-658-7581

March 20, 2018 – Legendary Field Exhibitions, LLC (dba AAF) announcement

https://www.thewrap.com/charlie-ebersol-nfl-alliance-american-football-vince-mcmahon-xfl/

Son of Dick Ebersol announces his own pro football league for 2019

Tony Maglio March 20, 2018 @ 9:56 AM

Charlie Ebersol, who directed the "30 for 30" documentary about dad Dick Ebersol and Vince McMahon's failed XFL, is forming his own professional football league. The Alliance of American Football will launch in 2019, undercutting the WWE chairman's XFL reboot by a year, the TV and film producer announced Tuesday.

The eight-team AAF will air its first game and its championship game on CBS, with one game per week in-between on CBS Sports Network.

Rosters will consist of 50 players per team, the regular season will run 10 weeks. The(re) will be a four-team playoffs.

In addition to Charlie Ebersol, the Alliance of American Football will be run by Bill Polian, former vice chairman of the Indianapolis Colts. Ex-Pittsburgh Steelers safety Troy Polamalu will oversee the players, while J.K. McKay will run the team side. Dick Ebersol will serve as an adviser to his son's league, as will retired NFL players Hines Ward and Justin Tuck.

The league will boast a shorter play clock than the NFL and fewer commercial breaks—both attempts to cut down the total time of the game. It will also eliminate the extra point, instead requiring two-point conversions after each touchdown.

That one is just a cool rule.

Additional rule alterations with player safety in mind include the removal of kickoffs (the offense will start at the 25-yard line) and instead of onside kicks, the losing team will begin at their own 35-yard line, facing fourth down and 10.

The Alliance's investors include Founders Fund, Slow Ventures, The Chernin Group, Adrian Fenty and Charles King's M Ventures, Keith Rabois and former NFL All-Pro Jared Allen.

The Alliance of American Football will kick off on Feb. 9, 2019 — one week after Super Bowl LIII.

Jennifer Maas contributed to this report.

May 14, 2018 – Article stating U.S. Supreme Court strikes down PASPA and federal ban on states operating sports betting

https://www.archerlaw.com/landmark-u-s-supreme-court-decision-paves-the-way-for-legalized-sports-betting/#:~:text=On%20May%2014%2C%202018%2C%20the,tristate%20area%20have%20already%20begun.

On May 14, 2018, the United States Supreme Court issued a highly anticipated decision that struck down the federal ban on state authorization of sports betting. This decision opens the door to states that wish to allow betting on sporting events, a process that all of the states in the tristate area have already begun.

In the Supreme Court case at issue, *Murphy v. National Collegiate Athletic Association*, the Court was faced with a challenge by New Jersey to the federal Professional and Amateur Sports Protection Act ("PASPA"). PASPA prohibited states from sponsoring, operating, advertising, promoting, licensing, or authorizing betting schemes based on competitive sporting events. The ban also applied to individuals, who were prohibited from sponsoring, operating, advertising, or promoting the same types of activities. Although the four states (Nevada, Delaware, Montana, and Oregon) that allowed sports betting at the time that PASPA was passed were allowed to continue their programs, the law prevented the rest of the states from legalizing sports betting.

Writing for the Court, Justice Alito held that PASPA violated the anti-commandeering rule of the Constitution. This rule, which is inferred from the structure of the Constitution and not from the text itself, prevents the federal government from commanding the states to undertake a specific act or refrain from undertaking a specific act. Since PASPA prevented the states from authorizing sports betting, it violated the anti-commandeering rule. The Court went on to strike down the rest of PASPA on the same grounds.

As stated above, many states have already taken steps to legalize sports betting. For example, New Jersey, which brought the suit challenging PASPA, has a 2014 law authorizing sports betting in casinos, licensed racetracks, and former racetracks. In addition, lawmakers are moving quickly to pass a comprehensive regulatory scheme to regulate sports betting, introducing a bill to that effect on May 14, 2016.

Delaware is even closer to implementing sports betting. Last week, Finance Secretary Rick Geisenberger issued a statement explaining that the state is preparing "to launch full-scale sports gaming in Delaware next month."

In 2017, Pennsylvania passed a law that would legalize sports betting in the state in the event that PASPA was repealed or struck down. With PASPA no longer on the books, Pennsylvania is free to allow sports betting in the state.

May 24, 2018 – Defendant CFL and Defendant ESPN, Inc. agree that all games of the CFL will be broadcasted on the company's platform (2 pages)

https://press.cfl.ca/espn-and-cfl-announce-entire-2018-season-broadcast-schedule

ALL 2018 CFL GAMES TO AIR ON ESPN NETWORKS AND ESPN+

CATCH ALL WEEK 1 ACTION, ENTIRE PLAYOFFS, GREY CUP ON ESPN NETWORKS AND 68 GAMES ON ESPN+

Thursday, May 24, 2018 — TORONTO/BRISTOL (May 24, 2018) - ESPN kicks off its 2018 Canadian Football League (CFL) regular season schedule televising all four games from the opening week beginning with the Edmonton Eskimos against the Winnipeg Blue Bombers on Thursday, June 14, at 8:30 p.m. ET on ESPN2.

Week 1 games continue on ESPN2 with the reigning Grey Cup champions, the Toronto Argonauts, visiting the Saskatchewan Roughriders on Friday, June 15, beginning at 9:00 p.m. ET. The opening week concludes with a double-header on Saturday; First the Hamilton Tiger-Cats travel west to take on the Calgary Stampeders at 7 p.m. ET. The backend of the double-header features the BC Lions hosting the Montreal Alouettes at 10 p.m. ET.

ESPN will also televise all four playoff games in November as well as the Grey Cup game.

Four preseason games and the rest of the CFL regular season games will be on ESPN+. For ESPN+ schedule click here.

Based on a multi-year agreement with the CFL, ESPN and ESPN+ have exclusive rights to present all regular season and postseason CFL games in the United States, including both the Eastern and Western Semi-Finals, as well as the 106 Grey Cup presented by Shaw. Production and commentator teams for ESPN telecasts are from TSN, Canada's Sports Leader. ESPN International and its affiliated networks also distribute CFL games internationally to more than 47 million households and 74 countries.

About ESPN+

ESPN+ is the first-ever multi-sport, direct-to-consumer subscription streaming service from The Walt Disney Company's Direct-to-Consumer and International segment and ESPN. It offers fans thousands of additional live events, on-demand content and original programming not available on ESPN's linear TV or digital networks. This includes hundreds of MLB, NHL and MLS games, Grand Slam tennis, Top Rank boxing, PGA Tour golf, college sports, international rugby, cricket, the full library of ESPN Films (including 30 for 30) and more. Fans can subscribe to ESPN+ for just $4.99 a month (or $49.99 per year) and cancel at any time.

ESPN+ is an integrated part of a completely redesigned ESPN App. Already the leading sports app, the new ESPN App is the premier all-in-one digital sports platform for fans and a showcase of the company's culture of innovation. With a richer, increasingly more personalized experience, the new ESPN App curates all of ESPN's incredible content into an experience unique to each fan's individual tastes. ESPN+ is also available through ESPN.com.

Lucas Barrett
Manager, Communications & Public Affairs, Canadian Football League

Built on a foundation of more than 110 years of football tradition and history, the Canadian Football League features nine teams, millions of fans and a commitment to service to the community, as well as, elite sport. To stay up to date with CFL news, visit CFL.ca.

September 11, 2018 – Article stating AAF and Defendant MGM RIO, Inc. in partnership for smart phone gambling app (3 pages)

Alliance Of American Football and MGM In-Game Betting Partnership
By Mike Murphy, Published September 11, 2018

A startup professional football league has formed an interesting alliance with MGM Resorts to bring in-game wagering directly to the fans. The Alliance of American Football (AAF) is set to kick off its first professional season on February 9th, 2019 and could become the first pro league in the country to fully integrate sports betting into the viewing experience.

On Monday, ESPN reported that the AAF has already built a gambling app that will not only allow fans to stream games for free but also to place in-game bets on that very same app. In a deal with MGM Resorts, the AAF will designate MGM as the league's official in-game betting partner for the league's first three seasons.

What makes this deal different than other deals such as the one recently signed by MGM and the NBA is that it involves more than just standard data sharing and naming rights. MGM and the AAF plan to take in-game wagering to a higher level by putting wearable devices on players that will track all sorts of in-game metrics, even down to the speed of the quarterbacks' passes.

Information collected by the wearables will be used by MGM and the AAF to produce more accurate betting lines and to create unique betting markets exclusive to MGM. MGM will be the only gaming firm able to tap into that data to create faster, more accurate in-game betting lines.

As ESPN explained with an example, MGM might determine the quarterback's chances of throwing an interception have increased based on the average speed of his passes and adjust the odds accordingly. Between hands-on oddsmakers and algorithms, the additional Alliance of American Football betting data will help MGM come up with accurate lines and give players access to all sorts of interesting types of bets.

Although there's nothing stopping other sportsbooks from watching the games live and offering in-play AAF betting – at least in theory – only MGM will have the ability to offer certain types of wagers such as how quickly the running back is moving down the field or the speed of the football after it leaves the quarterback's hand.

AAF – MGM Sports Betting Deal Also to Benefit Players

One of the more interesting aspects of the AAF and its deal with MGM is the potential impact for players. The Alliance of American Football has plans in place for some sort of revenue-sharing deal that will reward players based on the amount of wagering activity they generate among the fans.

AAF co-founder Charlie Ebersol told ESPN "There's really a limitless cap on what a player can make. Money from the number of bets placed on them is one of the ways." Some have raised questions regarding the plan. For one, what sort of integrity issues will this raise? If players know at least some of their compensation is based on the amount of wagering activity they generate, will that affect how they play the game?

51

Maybe that's an anticipated and even welcome side effect, but it could also spur lawmakers to more actively push for federal regulation. After all, it's no big secret that some in Congress are intent on passing federal sports betting laws.

About the Alliance of American Football

The Alliance of American Football is a pro football league designed to complement, rather than compete with, the NFL. It picks up right where the NFL leaves off every year so fans can stay in the game even after the Super Bowl.

The first AAF games are scheduled to kick off on February 9th and the first season will run for 12 weeks, culminating in a championship game to be held on the weekend of 26-28 April. The league is also designed to be a more fan-centric experience with ingrained betting options, a complementary fantasy league and all games streamed free on the AAF app.

For example, AAF players might receive financial bonuses when drafted by viewers during integrated fantasy sports games. This will motivate players to not only perform better on the field, but also to stay connected with their fans. Fans in turn will feel like they have an actual impact on the players.

Charlie Ebersol, son of former NBC Sports chairman Dick Ebersol, serves as the CEO and co-founder. Bill Polian, formerly of the NFL, is also listed as a co-founder and Head of Football for the AAF. Former NFL greats Jared Allen, Hines Ward, and Troy Polamalu are also involved as AAF executives.

Moving beyond its plans to include sports betting as an integral part of the AAF experience, the league reportedly has additional plans in place to differentiate itself from the NFL. Included among those plans are:

- All teams fully owned by the AAF
- No TV timeouts
- Limited commercial breaks
- Rules changes such as no kick-offs to increase player safety
- Viewers can catch select games on CBS and watch every game free on the AAF app

The business structure also includes at least two unique features that should appeal to fans and prospective players alike. As AdAge noted yesterday, the AAF has a "regional allocation strategy" in which the league will try to assign former college players to a team as close to their college hometown as possible to give fans one more reason to root for their local AAF team.

The AAF also has a unique system in place to woo a higher class of players. Rather than locking in players to contracts prohibiting them from ever returning to the NFL, AAF contracts will include an "NFL-out" clause allowing players to drop their AAF contract at the end of the season if the NFL calls them up. AdAge reports the standard AAF contract will be a three-year, $250,000 deal with an NFL-out clause.

Here's how Ebersol put it when speaking with AdAge:

"All previous spring football leagues were specifically designed to prevent players from going to the NFL. [An NFL-out clause allows the] highest-quality players to play in our league in a way in which they don't feel like they're giving up on their dreams."

52

Other player benefits include a greater commitment to safety, a comprehensive bonus system, post-football career planning, financial planning services and college education scholarships.

So far, the AAF has eight teams with 50-player rosters ready to go for the first season:

- San Diego
- Salt Lake
- Phoenix
- San Antonio
- Memphis
- Birmingham
- Atlanta
- Orlando

Mike Murphy, Gambling Industry Expert

Mike Murphy is the founder of BettingUSA.com and has over 10 years of experience in the legal gambling industry. A regular attendee of industry trade shows and conferences, Mike is a strong proponent in the idea of a well-regulated online betting industry.

February 19, 2019 – Article stating Defendant Tom Dundon agrees to invest in Legendary Field Exhibitions, LLC (dba AAF) (2 pages)

Hurricanes owner Tom Dundon invests $250M in AAF
By Emily Kaplan

Carolina Hurricanes owner Tom Dundon made a $250 million investment in the upstart Alliance of American Football and will become the league's new chairman.

The Athletic reported that the league was in danger of not making payroll on Friday, before Dundon's investment. AAF co-founder Charlie Ebersol dismissed reports that the league was getting a financial bailout from Dundon.

"This has been an extraordinary undertaking for us," said Ebersol, who less than a year ago partnered with Pro Football Hall of Fame executive Bill Polian to create the AAF. "It's a giant challenge and opportunity, and as a startup you are constantly looking for some peace of mind. When we got out of the first week of games, we saw there was so much interest from investors, and if we had one person who could take care of us for a very long time, that would be great."

The eight-team AAF, billed as a developmental league, kicked off the weekend following the Super Bowl. The 10-game regular season will culminate in an April 27 championship game. CBS broadcast the two opening games, and the league said more than 6 million people watched the AAF in its inaugural weekend.

Dundon said once he saw the league in action, it made his potential involvement in it an easier choice.

"I had seen the deal when they were conceptualizing the league," he said on the ESPN On Ice podcast. "It wasn't something that I would do, because there were so many questions about the quality of football and all the things that come up when you try to start something new. Once it went on TV, looked great, got good ratings, I talked to people that were supportive of it.

"At the same time, through mutual acquaintances, I understood they had a need for someone like me to step in. It all came together on Wednesday and Thursday of last week. I wish it was more thought out than that, but it was that simple."

Ebersol said in a statement, "Tom, Bill Polian, and I will work with our great team at the Alliance to expand our football operations and technology business. Tom is a self-made American success story who brings a wealth of knowledge in the sports, entertainment and finance worlds and proven leadership to our organization."

Ebersol is largely the one who raised the financial capital to get the league started -- a vision he began three years ago, eventually bringing Polian and others on board. The

AAF gave players three-year, $250,000 nonguaranteed contracts with unspecified bonuses related to incentives.

The league premiered on Feb. 9 on CBS, and 2.1 million people watched, according to ratings reports. Ratings, as expected, dipped when the league broadcast on cable channels to approximately 640,000 for the Week 1 Sunday night game on NFL Network. Ratings for Week 2 games, which appeared on TNT, NFL Network and CBS Sports Network, have not yet been released.

Some believe the NFL may one day buy the AAF, but Dundon said that wasn't on his mind when he made the investment.

"For whatever reason, people love American football," he told ESPN. "They watch it. There are enough good players ... about 1 percent of college players make it to the NFL. Now, with our league, maybe 2 percent of players get to play. It's viable just to be a support or development area for players whose ultimate goal is to get to the NFL.

"This league only exists because of the NFL's success. If the NFL had wanted to do it, they had the wherewithal to do it. I don't think about them as someone to buy a league. I think about them this as, 'Let's just create a league because it was a compelling thing to do.'"

The Hurricanes issued a statement from general manager Don Waddell reiterating Dundon's commitment to the NHL franchise.

"Tom is excited about the direction of the Carolina Hurricanes and remains fully committed to this franchise's current and future success in Raleigh," Waddell said.

Dundon, 47, is the former CEO of the Dallas-based lending firm Santander Consumer USA. He is the cofounder of Trinity Forest Golf Club in Dallas, home of the PGA Tour's AT&T Byron Nelson; the majority owner of Employer Direct Healthcare, a healthcare services company; and a primary investor in Topgolf.

The Hurricanes have not made the playoffs since 2009 -- the longest active drought in the NHL -- and Dundon has pledged to inject a new energy into the franchise, which has manifested this season with elaborate postgame celebrations after home wins.

The Hurricanes have struggled with attendance and have been long subject to relocation rumors after moving from Hartford, Connecticut, in 1997. However, when Dundon took over as majority owner, he agreed to not apply for relocation for seven years, which is a standard part of NHL purchase agreements.

In an email, NHL deputy commissioner Bill Daly said Dundon did not need permission from the NHL to make this investment in another sports entity. When asked whether the league was concerned that the Hurricanes would be adversely affected by an ownership pumping an investment of this size into another sports venture, Daly said: "No."

55

March 27, 2019 – WWE, Inc. SEC Form 8-K filing stating CEO Vince McMahon sold common shares to fund launch of Alpha Entertainment, LLC to support spring football and XFL (2 pages)


8-K 1 a8k.htm

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K
CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934
Date of Report (Date of earliest event reported): August 18, 2016
World Wrestling Entertainment, Inc.
(Exact name of registrant as specified in its charter)

Delaware 001-16131 04-2693383
(State or other jurisdiction (Commission File Number) (IRS Employer of incorporation) Identification No.)

1241 East Main Street, Stamford, CT 06902
(Address of principal executive offices) (Zip code)

Registrant's telephone number, including area code: (203) 352-8600

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2.):
☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company ad defined in Rule 405 of the Securities Act of 1933 (17 CFR 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR 240.12b-2).
Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Item 8.01. Other Events.

On December 21, 2017, Vincent K. McMahon ("Mr. McMahon"), Chairman and Chief Executive Officer of World Wrestling Entertainment, Inc. (the "Company"), sold 3,340,000 shares of the Company's Class A common stock in a block trade made in accordance with the provisions of Rule 144 of the Securities Act of 1933, as amended. Mr. McMahon executed the sale primarily to fund a separate entity from the Company, Alpha Entertainment LLC, which Mr. McMahon established to explore investment opportunities across the sports and entertainment landscapes, including professional football. Mr. McMahon has informed the Company that he has no current plan to sell additional shares of the Company's stock and that he intends to continue in his capacity as the Company's Chairman and Chief Executive Officer for the foreseeable future.

The shares sold by Mr. McMahon represent approximately 4.3% of the Company's total outstanding shares of Class A and Class B common stock. After the sale, Mr. McMahon beneficially owns 32,193,375 shares of the Company's Class B common stock, which represents approximately 82.8% of the Company's total voting power and approximately 41.8% of the Company's total outstanding shares of common stock.

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WORLD WRESTLING ENTERTAINMENT, INC.
By: /s/ Mark Kowal
Mark Kowal
Chief Accounting Officer and Senior Vice President, Controller
Dated: December 21, 2017

April 3, 2019 – Article recounting the history of the AAF (2 pages)

https://www.sportsbusinessjournal.com/Daily/Issues/2019/04/03/Leagues-and-Governing-Bodies/AAF-Timeline

LEAGUES AND GOVERNING BODIES
Gone So Soon: A Look Back At The Alliance Of American Football
BY DAVID RUMSEY
4.3.2019

The AAF yesterday suspended operations before the end of its inaugural season. The startup league that was formed by Charlie Ebersol just over a year ago at times appeared as though it could be a suitable developmental league for the NFL. However, with another chapter now seemingly closed in the book of spring football leagues, THE DAILY takes a look back at some of the highlights and controversies the AAF endured during its short existence.

March 20, 2018: Charlie Ebersol announces plans to launch a single-entity spring football league to begin play in February '19. Ebersol's father, Dick, will be on the AAF's BOD and the league will have financial backing from The Chernin Group and Founders Fund. Bill Polian is set to run football operations. CBS Sports is already signed on as a broadcast partner.

April 7: Steve Spurrier is announced as the AAF's first coach, set to lead the Orlando franchise. Spurrier would later be joined in the coaching ranks by notable names like Mike Singletary, Mike Martz, Dennis Erickson and Rick Neuheisel.

June 20: San Antonio is announced as the AAF's final market, joining Atlanta, Birmingham, Memphis, Orlando, Phoenix, Salt Lake City and San Diego as cities housing AAF teams.

September 10: MGM Resorts becomes the AAF's official sports betting partner.

September 20, 25: Names and logos of the AAF's eight teams are unveiled: the Apollos, Commanders, Express, Fleet, Hotshots, Iron, Legends and Stallions.

October 23: The AAF announces its championship game will be held at Sam Boyd Stadium in Las Vegas on April 27.

January 31, 2019: Turner Sports and NFL Network sign on as broadcast partners. TNT will carry one regular-season and one playoff game, while B/R Live will carry a weekly game. NFL Net will carry two games per week.

February 9: The AAF debuts in primetime on CBS to mostly positive reviews. The regionalized coverage draws a 2.1 overnight rating. Crowd sizes are deemed a success and the league is seen as a potentially viable developmental product for the NFL.

February 18: Hurricanes Owner Tom Dundon is named AAF Chair after committing to invest up to $250M in the league. Ebersol dismisses reports that Dundon's investment was a financial bailout. Reports had surfaced about the AAF nearly missing payroll after its first week of play; Ebersol said there was an issue with the league switching payroll companies. Spurrier says an initial investor backed out, leading to Dundon's involvement.

March 6: Polian states the AAF has held informal discussions with execs from NFL teams about potentially loaning young NFL players to the AAF to be developed.

March 16: Johnny Manziel becomes the biggest name to join the AAF after the CFL deems him ineligible to play in its league. Manziel generates some excitement for the Memphis Express and the league on the whole, but some pundits compare the move to a last ditch effort to bring attention to the initiative.

March 20: The AAF moves its championship game from Las Vegas to The Star in Frisco, leading some to believe it could help strengthen the league's ties to the NFL.

March 27: Dundon says the AAF could be in danger of folding because of its inability to secure cooperation from the NFLPA on using young players from NFL rosters.

April 2: The AAF suspends operations three weeks before the end of its first regular season. Dundon cites the league's inability to survive without a formal affiliation with the NFL.

May 1, 2019 – Article on the AAF and its true nature as a tech startup with significant operations developing a gambling app platform for smart phones (8 pages)

https://www.si.com/nfl/2019/05/01/alliance-american-football-aaf-collapse-charlie-ebersol-tom-dundon

The Curious Rise and Spectacular Crash of the Alliance of American Football
What happens when you launch a sports league that's really a tech startup, with a nebulous mission, shaky funding and a killer app promising more than it delivered? The inside story of how a football operation with Silicon Valley dreams fell apart before a single season could finish.

CONOR ORR – MAY 1, 2019

This story appears in the May 6, 2019, issue of Sports Illustrated.

As a cofounder of the Alliance of American Football, which launched in February as a spring alternative to the NFL, Charlie Ebersol could come and go wherever he pleased around the startup league. And so there he was on March 31, wandering around the visitors' locker room at the Alamodome, where the Arizona Hotshots had offed the San Antonio Commanders 23–6, soaking up the energy as Hotshots players belted out their adopted theme song: "Shots! Shots! Shots-shots-shots…"

At 36, Ebersol, with his tightly manicured scruff and sanguine smile, had already directed a 30 for 30 doc (This Is the XFL, about his father Dick's 2001 football flop) and been placed by The Hollywood Reporter atop a list of the most powerful players in reality television. Whether or not he understood it yet, however, this was not his highest moment.

Amid growing speculation that Ebersol's new league was on shaky ground, the Hotshots had flown to Texas in Week 8 on a plane much smaller than the one they were used to. On arrival they found their hotel space so inadequate that the offense did its pregame walkthrough in the parking lot. Across the league, employees were feeling a similar pinch. Nonessential personnel were increasingly barred from traveling at all. Work computers were suddenly inventoried. One player even recalls getting a notification on his team communications app, warning against taking expensive bottles of Cholula hot sauce away from the dining area. Now an impending doom was making its way to the media.

With this in mind, Hotshots linebacker Kaelin Burnett approached Ebersol. "Hey, Charlie," he asked, "should I show up on Monday?"

Ebersol half-laughed. "If you want to get paid."

However you cut it—even if you consider the Alliance's then-ongoing attempts to woo owners of future franchises, like rapper Eminem in Detroit—this was misplaced optimism. Weeks earlier, with funds depleting rapidly, Ebersol had sold controlling interest in the league to billionaire Tom Dundon, owner of the Carolina Hurricanes, who promptly removed Ebersol from a voting seat on the board of directors, leaving him with little say in the AAF's fate. Still, here Ebersol was reassuring an employee. "You're all going to be fine."

Three days after that game in San Antonio, with Dundon having already spent $70 million to keep the Alliance alive, the new chairman cut off his cash hose and the league suspended operations, immediately freezing the workdays of 940-plus employees. Within weeks the AAF would file for Chapter 7 bankruptcy, claiming some $11 million in assets against $48 million in liabilities. Cash on hand: $536,160.68.

As word of the crash came down on April 2, players scrambled to book their own flights home. Others, some of whom had literally crammed their kids' cribs into hotel rooms, searched for places to stay. In the mayhem, one Hotshots player texted a friend on the Memphis Express to ask if he was O.K. The reply: "This feels like the Fyre Festival."

If only it were that simple.

It would be easy to paint Ebersol as the naive hotshot in over his head. Or Dundon as the league's heartless executioner. The whole story, though, is far more complex. Conversations with more than a dozen people connected to the operation (most of whom asked not to be identified as they sought new employment) paint the picture of a corporate drama straight from the white-knuckle world of Silicon Valley startups. Of questionable funding that would suddenly dry up, and an early investor allegedly wrapped up in shady banking practices. Of secret software that promised to change sports gambling as we know it. Of players, coaches and execs serving as stagehands for the real grand design, a company that would use live football to experiment with and eventually sell off its technology—or, as one AAF engineer put it: a "petri dish for the NFL." And a "boon for gambling companies."

Who is to blame? A better question might be, What the hell was the AAF?

The vision laid out by Ebersol and cofounder Bill Polian was built around one core goal, that they become necessary to the pro football ecosystem, or at least valuable enough to exist as an offseason pacifier for what they calculated to be "millions" of fans who craved live football after the Super Bowl each February.

Games would be faster (under 2 1/2 hours), safer (no kickoffs), more transparent (live looks into officiating decisions) and more interactive (through gambling tech). The league would attract talent with standard three-year contracts, built-in raises, postcareer scholarships and bonuses that could be earned through stellar play and community engagement. Profit, it was projected, would come after three years, a slow-burn investment in hopes that the AAF would eventually become a sought-after television

property (even if at first the league paid to be broadcast, not the other way around), that individual franchises would become attractive enough to sell and, crucially, that the tech they developed and showcased would become desirable enough to license.

About that tech. Last July, half a year before a snap of football was played, a small number of early-hire employees hopped on a video conference call to preview an artist's rendering of the technology their outfit hoped to develop. First they were shown a smartphone, which in this demo displayed a Steelers game shot from a low SkyCam angle, playing out on a large video tile in the center. Flanking that were four smaller tiles, each showing the same action, zoomed in on an individual player. Touching a player's tile brought up a display at the bottom of the screen where you could view his energy bar, showing his level of fatigue, or engage in a variety of gambling-type activities. Probabilities for the upcoming play popped up, and the user could wager "points"—an effort, at least initially, to distance the project from actual gambling—on, say, whether the Steelers would run or pass, or in which direction.

It was an aspirational look at a still-developing product, but the intent was clear: Pair mountains of historical football data with machine learning to create predictive analytics the likes of which the sporting world had never seen. How likely is Mike Tomlin to pass on second-and-10 out of 11 personnel against nickel D? Then feed that data to viewers instantly and ask, How much do you want to bet on it? One employee who saw the presentation remembers thinking, If fans can gamble on this, you're pretty much printing money. This is the golden ticket.

And Ebersol had a tech team he believed could execute that vision. With engineers who'd worked for Lockheed Martin, BitTorrent and Tesla, they represented an abstract think tank in the budding world of football technology.

On the back end, though, they faced thorny issues like building predictive-analytic and machine-learning algorithms for tracking players, seamlessly integrating with networks and broadcast crews, and deploying high-end tech in decaying stadiums. "We had a small team and a limited amount of time," says one engineer, who says work on the mobile app didn't start in earnest until last November, four months after the demo, as they first rushed to build the platform through which everything would function.

What did launch—what fans at home and in stadiums found on the AAF mobile app this spring—didn't quite live up to the July demo. There was a live streaming video element, but it was separated from the predictive/gambling function where live game footage was replaced with simple digital renderings, using 3-D helmets to represent players. These renderings typically ran just 200 milliseconds behind the live action, but TV runs on a 10- to 15-second lag, so a fan at home could be wagering on a second-and-five play while the broadcast still showed first-and-10. Gone, too, was the energy bar. After experimenting with tracking players' fatigue levels, engineers couldn't find a way to keep heart monitors in place through heavy hits. One engineer says he understands how someone might have felt the user experience "kind of sucked" (even if the team was regularly adding features).

While one fellow sports-tech executive says the AAF's timeline and goals were unrealistic, the department remained a great source of pride for Ebersol.

Then Dundon took over. And he, says one engineer, "couldn't give a s--- about the tech." The same engineer recalls having a very brief conversation with his seemingly uninterested new boss . . . only to be fired when the league closed a few weeks later.

The tech team would later get a kick out of speculation that Dundon shut the league down in order to steal their work, perhaps even applying it to the Hurricanes. If that was the case, why the hell did he get rid of the only people who could make sense of it?

If anything, the new leader's apparent lack of interest in the tech should have heralded a change in direction. This was no longer a tech startup on a three-year march to profitability. To Dundon, it appeared, the Alliance was a fledgling football company that needed to show him something concrete.

The email from Ebersol to the entire Alliance went out on Feb. 22, 2019, at 5:34 p.m. ET.

This week, all of your hard work was validated and our company secured the necessary funding to accelerate growth into our next phase as a business. Tom Dundon, [now] our largest institutional investor and the control owner, will serve as chairman of the Alliance Board of Directors. He is excited and fired up about what we've created, and ready to propel the league forward for many years to come...

It was a strange but optimistic time for the AAF, which had opened with two weeks of solid attendance (19,400 per game) and ratings comparable to most NHL or MLS games. Teams had kept their preseason camps closed to media to protect their fragile product—past startup leagues had suffered when they debuted with sloppy play—but in February the reviews were largely positive. Football was not the problem.

The football product wasn't the problem—the level of play in the AAF drew generally positive reviews.

According to multiple people familiar with the AAF's business operations, the arrival of Dundon (an initial investor candidate who had acquaintances in common with Ebersol) coincided with a difficulty in accessing some of the funds already pledged to the league. Reggie Fowler, once a minority stakeholder in the Minnesota Vikings, had committed to being the Alliance's primary investor during its first season and had already injected nearly $25 million. But withdrawals from Fowler's various foreign and domestic banks were suddenly, and without a full explanation to the Alliance's board, held up around Christmas.

That explanation would come months later. The Department of Justice announced on April 30 that Fowler had been charged with bank fraud and operating an unlicensed

money-transmitting business. (Fowler had a detention hearing scheduled for May 2 in Arizona; an Israeli alleged co-conspirator remains at large.) Around the same time that Fowler was theoretically engaging in discussions about funding the new football league, authorities allege he was was also operating "shadow banking services" on behalf of a crypto currency exchange company that misrepresented money transfers and skirted international "anti-money laundering verification services."

With Fowler's funds tied up, in stepped Dundon, promising a new $250 million, which it was understood would carry the Alliance through its first three years, under the condition that he be the new primary investor. That agreement, consummated by phone—a shotgun wedding by all accounts—came at an immense cost to Ebersol, who stayed on as CEO but lost his voting seat on the board. (His father, Dick, was also removed.) Dundon would be the AAF's new controlling owner, and it would show.

The founder of a subprime auto-loan financing outfit, Dundon believed he could maximize the AAF's returns more quickly. And while some thought the league was over-spending in certain sectors, others recoiled when the new leader went searching for savings under every rock, including revisiting TV and camera-equipment deals that had been built upon the Ebersols' personal relationships.

One insider says Dundon earned the nickname Trump, based on his slashing of budgets and his hard-liner approach to renegotiating deals. Suddenly the necessity of certain business trips was questioned. Meals were cut from team flights. Every expenditure had to be rationalized. "As soon as Dundon took over," says one former mid-level employee, "our f------ expense reports were getting approved out of Dallas," where the billionaire was based.

It may have been due diligence on the television front, however, that eventually helped inform Dundon's decision to shut it all down before his investment reached nine figures. According to a high-level sports exec from one of the four major networks, Dundon called to ask about the Alliance's TV future. What he learned: While it wouldn't necessarily always be this way, the AAF would have to continue paying to be on the air for the foreseeable future. The Alliance would remain an underdog fighting for TV time in a crowded sports marketplace.

If Dundon felt the promise of the league differed from what was delivered, it showed. He took charge of the media messaging, first publicly floating the idea of working with the NFL Players Association as a long-term partner, borrowing from them third- and fourth-string NFL players who could cement the Alliance's status as a developmental league, and then, on March 27, telling USA Today the league was in danger of folding without such a relationship. (That announcement came as a shock to many in the AAF but would come to be understood as Dundon's negotiating style.)

And so everyone marched on, pragmatists and dreamers squeezed together, each trying to be the one out front.

In fairness to Tom Dundon, the league he took over in February was already flawed, even if some of those flaws could be spun more positively as quirks. For all of the Alliance's innovations, one of its most ambitious aspects (especially for a single-entity operation where the league owned each team, like MLS), was its decentralized business model, with employees in 30-plus states. There were core staffers in San Francisco and in Florida, a few people operating out of a small Beverly Hills office, and key cogs in the media relations department working from home, across several time zones.

At his launch press conference in March 2018, Ebersol had addressed the meaning of the league's name, describing an alliance between "the fans, the players and the game." Unmentioned went certain lower-profile but equally important elements of the infrastructure. His boldest undertaking might have been in forging bonds between walks of life that have the tendency to ricochet off one another. While employees on both the football and tech sides describe a largely harmonious relationship, for example, sources in each camp blame the other side for extraneous spending and other inconveniences. Like: Why does the football side need new state-of-the-art equipment and an XOS video system? Why does the tech side need all those servers? And, hey, is that engineer really making more money than someone calling the actual plays? One former employee recalls discussions about creating a position to liaise between the tech and football divisions, in order to curb conflict.

It's difficult to imagine someone who's lived by the NFL's typical rigidity adopting the soul of an iconoclastic tech entrepreneur. But many in the AAF say Ebersol wore that costume well, and perhaps one of his weaknesses as a leader was his trying to give everyone exactly what they wanted. Still, one person who categorized the situation as a "divide" seemed to think Ebersol was closer in his makeup to those who aspired to see the operation into its full potential as a tech company. And there was an aspect of the now-blended Silicon Valley–celebrity culture that could rub some of the more ingrained football people the wrong way. Like when Ebersol was interrupted in a meeting by a call from actor Ashton Kutcher.

Employees on the tech and business sides, meanwhile, seemed to have a better understanding than their football counterparts of the constant pivoting and pinballing that tends to occur in a startup of any kind. In its infancy (even now, some would argue) Facebook was hampered by palace intrigue and technical deficiencies. Early on, Apple, too, was wild enough to warrant a feature film about internal discord. But when you take a startup, which the AAF was built as, and drop in militaristic coaches who wear the same outfit every day and take their coffee at the same time each morning, interruptions in normalcy can, at the least, be a distraction. A few curveballs that caused varying degrees of consternation:

• Brad Childress, an NFL coaching veteran of 20-plus years, inexplicably walked away from his position leading the Atlanta Legends after just three practices. The team promoted defensive coordinator Kevin Coyle, then rolled through a handful of offensive coordinators and advisers: Michael Vick, Ron Turner and, finally, Ken Zampese. One of

those coaches was there for mere days; others never made it to the role of play-caller at all.

• According to one employee, the tech side experienced a delay on an order for servers and switched media-storage platforms four times in a two-week period, all before the season started. These little technological shifts were a constant annoyance for the football department, and for those who constantly had to call and explain the new software.

• The league missed payroll by 12 hours after Week 1. And while those on the business side claim this resulted from a change in payroll companies, already some coaches and players were concerned. (It would be reasonable for those on the football side to associate the timing of the delayed paychecks with the disappearance of Fowler's money and the gap before Dundon came on.)

A successful first few weeks on the field calmed nerves, though, and some of those extraneous issues were buried as coaches and execs found themselves consumed by the weekly grind, lost in the game. That attitude was reflected by the front-office types they had most regular contact with. On March 20, one week before USA Today reported that the league was in danger of folding, the staff received another email from Ebersol, celebrating their one-year anniversary. "This endeavor," he wrote, "is a tremendous challenge each and every day. We are tested in so many ways we couldn't even have predicted a year ago. Of course the challenges will continue to appear and each will seem more difficult than the last. Alone some of these challenges would be insurmountable, but together…"

He finished, "I will quote Kevin Garnett…Anything is possible. Good luck this weekend and for many more years to come."

Players on the Memphis Express were in their locker room getting dressed for a practice near the Liberty Bowl when everything came undone. A few individuals had already started seeing early reports on their phones that the Alliance would suspend operations—then the team's equipment manager told them all to get to the main building, on the University of Memphis campus, for a meeting. There, coach Mike Singletary, a Pro Football Hall of Famer, instructed everyone to head back to their hotel rooms at the Sonesta ES Suites on Old Poplar Pike Road. They'd figure out the next step.

At the Sonesta, though, hotel staffers told everyone their room bills hadn't been paid and that they had to pack up and vacate the premises "right now," remembers one player. A deadline of 30 minutes was set, but eventually a more reasonable solution was settled upon: Stay the night and be gone by 7:30 a.m. Players were in shock. They wandered around the lobby trying to book flights or call their agents. They scrambled to pack their cars.

Adrien Robinson, a fourth-round pick of the New York Giants in 2012, had learned about the league through his girlfriend's mother—an NFL personnel man had walked into her furniture store one day in Albany, N.Y., back in '18, and struck up a

conversation. Shortly afterward, the 30-year-old tight end left his factory job, tested well at the Alliance combine and landed a spot with the Express. It was a godsend for his family, with two young girls and a son on the way. Over eight games with Memphis, Robinson caught seven of eight targets for 40 yards, finally giving him a bit of recent film to circulate to the NFL.

That fleeting bit of progress flashed across his mind as he opened up a notification on his Teamworks app that afternoon in the Sonesta lobby. A message from an assistant on Memphis's operations team told him, "You need to pack up tonight and leave tomorrow. It was my pleasure working with you. I wish you success in the future."

Robinson's headaches were only beginning. The next morning he woke up to a $2,500 charge on the credit card he'd put down for hotel incidentals. For players, free housing had been promised to anyone willing to have a roommate, but now it looked like the hotel was simply taking any card on file and hitting it with the entire bill. Robinson called his own bank and was told the charges were pending; there was nothing they could do yet. He dialed the personnel assistant who'd sent the message about leaving the hotel, but no one answered.

As Robinson's debacle played out live on Twitter—along with those of now-jobless players hustling for the airport, guys with broken bones wondering who'd fix them up— the saga privately carved the hearts out of those who still believed in the Alliance. Even for anyone who saw the AAF as a startup tech company, trust and respect had been earned by some pretty high-minded, egalitarian ideas. Now, none of that mattered, even if, after some early confusion, medical services were made available through April. Even if everyone (stadiums and vendors aside) eventually got paid—or paid back, in the case of Sonesta's hotel guests. Even if the tech they were developing finds its way into our football lives sometime soon. For this moment, the Alliance was the Fyre Festival.

Which, again, was…whose fault? There may never be a satisfying answer. Perhaps, once all the brand-new football equipment and high-end cameras are auctioned off a few weeks from now as part of the AAF's Chapter 7 proceedings, and once Fowler's court case is adjudicated, everyone will move on. (Fowler's charges of bank fraud and conspiracy to commit bank fraud each carry a maximum of 30 years in prison; charges of operating an unlicensed money transmitting business and conspiracy to operate such a business each carry a five-year max.) What's left, the words and actions of millionaires and billionaires trying to control the narrative (Dundon and Ebersol declined to comment for this story; Fowler did not respond to calls before his arrest), won't do much, anyway.

Not for the players, the low-level coaches and mid-level office employees who thought they'd latched onto something real, and who now can't even get COBRA to continue their health insurance. Not for people like Robinson, who ultimately packed his things and headed home to Albany, hoping the next new spring league might have a spot for him. February will see the launch of the rebooted XFL. Whatever that ends up being.

August 21, 2019 – Article stating Defendant MGM RIO, Inc. acquires AAF gambling app in bankruptcy proceedings (2 pages)

https://www.casino.org/news/mgm-buys-aaf-sports-betting-app-in-court-approved-sale/

## MGM Resorts International Buys Bankrupt AAF Sports Betting App in Court-Approved Sale

Steve Bittenbender, August 21, 2019

A judge earlier this week approved the sale of a now-defunct professional football league's sports betting application to MGM Resorts International.

The Alliance of American Football may not have lasted long, but MGM Resorts International hopes the technology will. A US Bankruptcy Court judge approved the sale of the league's app to MGM, which invested in its development.

On Monday, US Bankruptcy Judge Craig A. Gargotta in Texas ruled in favor of the Las Vegas gaming company's acquisition of intellectual property (IP) owned by Legendary Field Exhibitions LLC, the New York-based owner of the Alliance of American Football (AAF).

As part of the agreement, which was filed nearly two months ago, MGM agreed to pay $125,000 to the debtors for the property.

The AAF kicked off its inaugural season in February, the weekend after the NFL's Super Bowl, to some acclaim. However, the young league quickly hemorrhaged money. Just nine days after its first games, Tom Dundon, owner of the National Hockey League's Carolina Hurricanes, agreed to invest up to $250 million into the league for a majority stake in it.

On April 2, with just two weeks left in the regular season, AAF officials suspended operations. The day before, according to court documents, the league and MGM entered into an agreement granting MGM "a perpetual, irrevocable, and fully paid-up license" for the IP.

While the AAF's trustee said he knew other creditors would claim ownership of the intellectual property, he urged Gargotta to approve the sale for several reasons, which included that any court case over the IP would take time and money.

Approval of the Settlement Agreement is expected to expedite the liquidation of one of the Debtor's assets, avoid disputes, and maximize estate recoveries under the circumstances," the agreement stated.

In addition to the payment, MGM further agreed to reduce its claim against the bankrupt league from $7 million to $5 million.

According to a statement made to the court by Scott Butera, MGM's president of interactive gaming, MGM loaned the start-up league $7 million for IP development. The property was a mobile application that would, once finished, offer in-game betting options and provide bettors "biomechanical data" they could consider when making wagers.

That data would be transmitted in less than a half-second.

As of April, when the AAF filed for liquidation, the app was not operational, according to Butera's statement. "In order for the app to become operational, Butera said MGM expects it will need to invest millions of dollars into the project. Then, once

68

operational, Butera added that the technology will need league partners to generate revenue, and that the company would need to market the technology in order to acquire enough users to make a profit."

Currently, MGM serves as a betting partner for Major League Baseball, the National Basketball Association, and the National Hockey League (NHL).

Other companies are working on similar applications, and Butera admitted that he was uncertain if MGM could make the AAF's app competitive.

However, "if the IP is not developed going forward, its value will diminish, and it may become obsolete and unusable," he concluded in his statement.

An MGM spokesperson told Casino.org the company would not comment Wednesday on the acquisition.

On Friday, a lawyer for Colton Schmidt and Reggie Northrup, both of whom played in the AAF, filed an objection to the admissibility of Butera's statement in advance of Monday's hearing over the sale.

The players' objected primarily because they believe the IP was the league's only "asset of value" in liquidation, and the $125,000 sale price was harmful because they "subjected themselves to serious risk of physical harm" in playing for the league.

The players also argued that MGM believes the IP to be worth far more than what they offered, noting a USA Today article that quoted league co-founder Charlie Ebersole saying the AAF planned to spend at least $500 million over a five-year period to develop it.

October 28, 2019 – Article stating Yahoo Sports enters historic partnership with Defendant MGM RIO, Inc.'s betMGM gambling app (2 pages)

https://sports.yahoo.com/yahoo-sports-bet-mgm-enter-historic-partnership-in-sports-betting-realm-042132876.html

Yahoo Sports, BetMGM enter historic partnership in sports betting
Frank Schwab, Monday, Oct 28, 2019

When the United States Supreme Court overturned a federal ban on sports gambling in 2018, allowing individual states to decide whether to make sports betting legal, the walls between sports and sports gambling came down.

Leagues have embraced casino partners and acknowledged that fans enjoy betting on their games. Announcers casually drop in references to point spreads during broadcasts. The landscape quickly changed.

The next step will be a partnership between Yahoo Sports and BetMGM. Guru Gowrappan, CEO of Verizon Media and Jim Murren, Chairman and CEO of MGM Resorts International, announced that Yahoo Sports and BetMGM have entered into a partnership to "power sports betting for Yahoo Sports and create collaborative content experiences and live events."

What does the announcement mean for fans?

The multiyear partnership makes Yahoo Sports the official Digital Media Sports Partner of MGM Resorts. The integration will launch in the Yahoo Sports app (iOS or Google Play) in November in the United States. Transactions will take place on the BetMGM platform.

The NBA, NHL, football, college sports, baseball, soccer, golf, and tennis will be included in the integration.

"The historic partnership with Yahoo Sports and BetMGM will change the future of fandom, providing new ways for sports fans to go beyond engaging with content and interact through commerce," Gowrappan said in a release. "At Verizon Media we believe in building products that connect consumers to their passions and drive the deepest end-to-end value possible."

MGM will distribute Yahoo Sports content across its properties and platforms, and Yahoo Sports will host multiple player events at MGM Resorts properties.

"This partnership marks an important moment for BetMGM in the growing U.S. sports betting sector," Murren added. "Integrating Yahoo's leading fantasy sports operations and content with BetMGM's world-class sports betting and interactive platform uniquely positions us to drive market share and large-scale adoption among sports fans."

Leagues embrace Yahoo Sports, MGM partnership

The NBA and NHL have already entered partnerships with MGM, and commissioners of both leagues said in statements that the new Yahoo Sports partnership will benefit their fans.

"As sports betting continues to transform the industry, this partnership brings together the power of two trusted partners of the NBA," NBA commissioner Adam Silver said. "By working together, MGM Resorts and Yahoo Sports will offer fans unprecedented ways to engage with our games."

"The expanding sports betting landscape presents exciting opportunities to increase fan engagement and leverage emerging technologies," NHL commissioner Gary Bettman said. "MGM

70

Resorts, a valued partner of the NHL, along with Yahoo, a leading media brand, will connect fans to the action on the ice in new and innovative ways."

The sports betting world is growing rapidly. The new partnership between Yahoo Sports and BetMGM is another sign of a new era in that realm.

Frank Schwab is a writer for Yahoo Sports. Email: shutdown.corner@yahoo.com or on Twitter: @YahooSchwab

March 24, 2020 – WWE, Inc. SEC Form 8-K filing stating CEO Vince McMahon sold common shares (2 pages)


8-K 1 a8k.htm

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K
CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): August 18, 2016

World Wrestling Entertainment, Inc.
(Exact name of registrant as specified in its charter)

Delaware 001-16131 04-2693383
(State or other jurisdiction (Commission File Number) (IRS Employer of incorporation)
Identification No.)

1241 East Main Street, Stamford, CT 06902
(Address of principal executive offices) (Zip code)

Registrant's telephone number, including area code: (203) 352-8600

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2.):
☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company ad defined in Rule 405 of the Securities Act of 1933 (17 CFR 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR 240.12b-2). Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. □

Item 8.01. Other Events.

On December 21, 2017, Vincent K. McMahon ("Mr. McMahon"), Chairman and Chief Executive Officer of World Wrestling Entertainment, Inc. (the "Company"), sold 3,340,000 shares of the Company's Class A common stock in a block trade made in accordance with the provisions of Rule 144 of the Securities Act of 1933, as amended. Mr. McMahon executed the sale primarily to fund a separate entity from the Company, Alpha Entertainment LLC, which Mr. McMahon established to explore investment opportunities across the sports and entertainment landscapes, including professional football. Mr. McMahon has informed the Company that he has no current plan to sell additional shares of the Company's stock and that he intends to continue in his capacity as the Company's Chairman and Chief Executive Officer for the foreseeable future.

The shares sold by Mr. McMahon represent approximately 4.3% of the Company's total outstanding shares of Class A and Class B common stock. After the sale, Mr. McMahon beneficially owns 32,193,375 shares of the Company's Class B common stock, which represents approximately 82.8% of the Company's total voting power and approximately 41.8% of the Company's total outstanding shares of common stock.

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WORLD WRESTLING ENTERTAINMENT, INC.
By: /s/ Mark Kowal
Mark Kowal
Chief Accounting Officer and Senior Vice President, Controller
Dated: December 21, 2017

April 14, 2020 – Article detailing the history of failed professional football leagues (note United Football League from 2009 – 2012; this was the most recent failed league at the time of Plaintiff's disclosure to Defendant Carol Riddick in May 2016) (2 pages)

History of Failed Pro Football Leagues
By Rob Joyce, 1080 WTIC NEWSTALK, April 14, 2020

The modern era of the National Football League is considered to have started in 1969, when the NFL officially merged with the AFL to create the league we've all come to know. Originally meant to compete with the NFL, the American Football League was the closest thing that the behemoth has had to a true "competitor". Since 1969 there have been plenty of upstarts to come in and try to either steal the spotlight or become a minor league of sorts, and just about all of them have failed.

The XFL just did it for the second time. The coronavirus was too much for the new league to overcome, and late last week it suspended operations with no plans for a 2021 season. It joins a laundry list of other short-lived efforts to expand pro football beyond the NFL's shadow.

World Football League (1974-75)
Promoted as a league that would expand beyond the borders of the United States, the WFL didn't quite live up to its name. Of the 13 teams to play a game, all were within the U.S. and just one (The Hawaiians) was off the mainland.

It was a disaster from the start. There were poor ticket sales, they rushed to get games started without having money to pay players, so many fought to get out of their contracts. An owner was arrested for drug trafficking. Somehow it started a second season in 1975, but in Week 13 of a scheduled 18-game season, it finally folded.

USFL (1983-85)
The United States Football League didn't directly compete with the NFL, playing its games in the spring and summer. Similar to the WFL - and, frankly, most of these pro leagues - money was a problem from the start for some franchises, and it was self-inflicted. With no salary cap, teams splurged trying to bring in big-name talent.

After three seasons of successful enough football, the league took a big step after the 1985 season by agreeing to move to a fall schedule, to directly compete with the NFL. The man largely behind the drive? New Jersey Generals' owner Donald Trump. The league filed an antitrust lawsuit, claiming the NFL had a monopoly. The USFL won... and was awarded $1 for its efforts. Out of money, it never played a game in 1986.

XFL (2001)
Vince McMahon's first foray into professional football was more publicity stunt than real football. Over a decade before concussions became part of the normal discourse, the XFL promoted its rough play, had scantily clad cheerleaders and everything surrounding

the actual game had the feel of a then-WWF fight. The eight-team league lasted just one season, with NBC and WWF losing $35 million each before the league closed its doors.

It did, however, bring the skycam to the world of television.

United Football League (2009-12)
The longest-lasting of all these leagues, the UFL tried to take former NFL players and ex-college stars to draw interest in the fall. Between high school, college and the NFL, it lost that battle.

Though it lasted for three full seasons and part of a fourth, the league never had more than five teams active at once - including the Hartford Colonials, who played at Rentschler Field. In October 2012 the league ran out of money and ceased operations immediately, with plans to return in fall 2013. Those plans went unfulfilled.

Alliance of American Football (2019)
The Alliance had the right idea, saying from the beginning it hoped to become a minor league system to the NFL. The spring league debuted last February to decent ratings, but those quickly waned as the novelty wore off.

Almost immediately there were reports of financial woes. After just a few weeks there were reports the league needed a bailout to make payroll. Just nine days after its first games were played, Hurricanes' owner Tom Dundon invested $250 million into the AAF and received a majority share. It quickly turned into a bad investment, and by April 2 - just seven weeks into playing football - the league folded. When it filed for bankruptcy it had $11.3 million in assets, $536,000 in cash and a whopping $48.3 million in liabilities.

XFL (2020)
Back with a very toned down message compared to its 2001 sister league, the XFL looked much better when it debuted in February. After just five weeks, though, it had to shut down like everyone else because of COVID-19. Unlike the much more established leagues, though, such a young operation couldn't withstand not playing. On April 10 it suspended operations, and this week filed for bankruptcy.

Like in 2001, however, it brought innovations that at some point could come to the NFL, notably the kickoff rule and the in-game interviews with players and coaches.

July 7, 2020 – Alpha Acquico, LLC's filing creating the entity in Delaware

Entity Details
THIS IS NOT A STATEMENT OF GOOD STANDING

File Number:        3280298
Incorporation Date / Formation Date:        7/20/2020
                                            (mm/dd/yyyy)

Entity Name:        XFL PROPERTIES ACQUICO LLC
Entity Kind:        Limited Liability Company
Entity Type:        General
Residency:          Domestic
State:              DELAWARE

REGISTERED AGENT INFORMATION
Name: THE CORPORATION TRUST COMPANY
Address: CORPORATION TRUST CENTER 1209 ORANGE ST
City: WILMINGTON County: New Castle
State: DE Postal Code: 19801
Phone: 302-658-7581

August 3, 2020 – Article stating Defendant Dwayne Johnson and others acquiring XFL
(2 pages)


Dwayne 'The Rock' Johnson, investor group agree to buy XFL for $15M
By Kevin Seifert

A group including actor and former WWE star Dwayne Johnson has agreed to purchase
the XFL for about $15 million, according to a news release issued Monday morning.

The XFL declared Chapter 11 bankruptcy April 13 and has been seeking a buyer for the
past three months, marketing itself as a made-for-TV product that could transition as
early as 2021 to a bubble concept during the coronavirus pandemic.

Johnson and his investors—who include his business partner Dany Garcia along with
RedBird Capital Partners—are making plans to play next season, Garcia told ESPN.

"We're planning for it," said Garcia, the first female owner of a major American sports
league. "We're doing all the steps that need to happen for the execution of that. But
we're also being mindful to what has actually been successful. It has been really
interesting to see that [in sports], when you create a bubble, your players are safe.
When you don't, it's chaos. We are a league, because of the number of teams we have,
that actually can create a bubble environment. Those discussions are active."

The sale must be approved by a bankruptcy judge at a hearing Friday. Monday
afternoon, the bankruptcy court's committee of unsecured creditors filed an objection
based on certain assets included in the sale.

Garcia will have an executive position with the XFL and said that both she and Johnson
will have a hands-on approach to running the league. Asked about hiring other
executive-level leaders, she said: "We've been in close discussion with the current XFL
management team."

"There are a lot of excellent people in that team," Garcia said. "While it's not 100% just
turning the lights on, there is still a tremendous amount of infrastructure and
relationships that you can actually call people back, pull people back. We saw the work
that they were doing for this year, and there was some excellent, excellent work.
There is a team there."

XFL president and chief operating officer Jeffrey Pollack is among the league's few
active employees. Most were laid off April 10.

The XFL has twice shuttered after one season, first in 2001 and again earlier this year
as a result of the pandemic, and there hasn't been a successful alternative professional
football league since the AFL forced a merger with the NFL in 1970. But XFL owner
Vince McMahon had been a determined aspirant, investing $200 million in the league's

second incarnation, one that promised to "reimagine" the game. But the eight teams suspended play after five weeks.

McMahon considered bidding on the XFL himself early in the bankruptcy process but ultimately decided against it.

In a statement, Johnson, 48, provided a glimpse of the McMahon-like flair he could bring to the league.

"The acquisition of the XFL with my talented partners, Dany Garcia and Gerry Cardinale, is an investment for me that's rooted deeply in two things -- my passion for the game and my desire to always take care of the fans," said Johnson, who played football at the University of Miami from 1990 to 1994. "With pride and gratitude for all that I've built with my own two hands, I plan to apply these calluses to the XFL and look forward to creating something special for the players, fans and everyone involved for the love of football."

In a statement, Pollack called the pending sale "a Hollywood ending" and said Johnson's investors are "a dream team ownership group and the XFL is in the best possible hands going forward."

Cardinale is the managing partner and CEO of RedBird, which manages more than $4 billion in assets. Last week, it purchased a controlling interest in Toulouse Football Club, a French soccer team. In November, it invested $125 million in a new company that secures commercial rights for the NFL.

Organizational plans for the newest version of the XFL are not clear. McMahon fired XFL commissioner Oliver Luck on April 9, and Luck responded by suing McMahon for wrongful termination and is seeking $23.8 million. The lawsuit was on hold awaiting the results of the bankruptcy.

The league averaged 1.9 million television viewers per game and generated nearly $20 million in gross revenues in 2020, according to court filings. It had projected $46 million in gross revenues for the 10-game season, each data point exceeding internal expectations, according to sources.

October 1, 2020 – Plaintiff's email to Defendant Redbird Capital Partners, LLC seeking audience with Defendant Gerry Cardinale

XFL

David Smith <email redacted>
Thu 10/1/2020 10:47 AM
To: info@redbirdcap.com <info@redbirdcap.com>

To Whom it May Concern:

My name is David Smith and I am the fellow with whom the concept for both XFL 2020 and the now defunct AAF originated with. If you don't believe me, call Vince McMahon and ask him which of his Board Members at WWE spoke with me. I will confirm the identity of that person.

I would like to get on Gerry Cardinale's schedule to discuss. I am in the process of suing WWE Inc for this violation of my intellectual property and while I don't think that I will have any claim on XFL directly due to the closed bankruptcy proceedings and other factors, the concept was mine originally and not one but two groups have screwed it up. Wouldn't you be curious to know the full extent of the concept which these two groups obviously thought was worthy enough to steal it and exclude me from it? I mean, now that you will be investing, presumably, close to a billion reasons why you hope that you do a better job than these two groups did?

I will simply state that they did not scratch the surface of the full concept in their half-ass ventures. And I will look forward to speaking with Mr. Cardinale at his earliest convenience.

Sincerely,
David Adrian Smith
<phone redacted>
<email redacted>

March 10, 2021 – Defendant Canadian Football League and Defendant Alpha Acquico, LLC (dba XFL) discuss mutual business

XFL, CFL talk of potential partnership in post-pandemic return
By Kevin Seifert

The XFL and the CFL are discussing options for collaboration as they plan their return to the field following the COVID-19 pandemic, representatives of both leagues confirmed Wednesday.

Statements released by CFL commissioner Randy Ambrosie and XFL chairwoman/owner Dany Garcia did not reference the possibility of a merger. They indicated that talks are in very early stages but offered no boundaries on the depth of the potential partnership.

"We look forward to seeing what possibilities our discussions might uncover, and to sharing those with our fans as the process unfolds," Ambrosie said in part.

As the discussions continue, planning for the XFL's 2022 season is on pause pending the outcome of conversations with the CFL, according to XFL president and CEO Jeffrey Pollack on Wednesday.

"Since we first acquired the XFL, we have focused on identifying partners who share our vision and values on and off the field," Garcia said. "A vision filled with opportunity, innovation and the highest level of entertainment value for the benefit of our athletes, fans and communities. The CFL has expressed that similar sentiment and jointly we recognize a great opportunity to build exciting innovative football experiences that make the most of each league's unique strengths."

The statements largely framed the discussions in the terms of their innovative histories, and indeed both leagues feature significant variations from the conventional format used in the NFL and U.S.-based college football. In addition, Garcia has spoken previously about making the XFL a global brand.

But the CFL in particular was hit hard by the COVID-19 pandemic and might find a financial advantage to shared resources. The CFL canceled its 2020 season after failing to secure $30 million in aid from the Canadian government. It has announced a full 2021 schedule that would begin with preseason games in late May, but it is unclear how the ongoing pandemic will impact attendance at games, which accounts for the league's primary revenue stream.

The XFL canceled its 2020 season after five weeks of games and was put into bankruptcy proceedings by former owner Vince McMahon. Garcia and fellow owners Dwayne Johnson and RedBird Capital Partners paid $15 million for the league last summer.

July 7, 2021 – Defendant Canadian Football League and Defendant Alpha Acquico, LLC (dba XFL) call off talks of mutual business

XFL planning 2023 return after talks on partnership with CFL tabled

The XFL announced on Wednesday that it is planning to relaunch in 2023 after talks with the Canadian Football League about collaboration between the two leagues were tabled.

The XFL and CFL both said in separate statements that the decision was jointly reached between the leagues.

"Our talks with the XFL, exploring the potential for collaboration and innovation, have been positive and constructive. While we remain open to finding new ways to work together in the future, we and our XFL counterparts have jointly decided to not pursue any formal arrangements at this time," the CFL said in a statement.

After the CFL's announcement, the XFL announced on its website that it is returning in 2023 and not next year as was previously announced.

"While our discussions with the CFL did not ultimately lead to a collaboration, the effort reinforced our belief and commitment to developing the XFL for international spring football. We look forward to seeing everyone for kickoff in spring of 2023," the league said in a statement to the Sports Business Journal.

The CFL said it is set to open its 2021 regular season on Aug. 5 and hold its championship game, the Grey Cup, on Dec. 12 in Hamilton, Ontario.

"We are looking forward to this year and a bright future for our league," the league said in the statement.

The CFL and XFL confirmed in March that they were discussing options for a potential partnership as they planned their return to the field following the COVID-19 pandemic.

The CFL canceled its 2020 season after failing to secure $30 million in aid from the Canadian government.

The XFL canceled its 2020 season after five weeks of games and was put into bankruptcy proceedings by former owner Vince McMahon. Dany Garcia and fellow owners Dwayne Johnson and RedBird Capital Partners paid $15 million for the league last summer.

ESPN's Kevin Seifert contributed to this report.

July 25, 2021 – Tweet by Defendant Dwayne Johnson announcing that Defendant
Alpha Acquico, LLC (dba XFL) has moved headquarters to Arlington, Texas


Dwayne Johnson
@TheRock

Proud to announce that our HQ will be in the great state of Texas - in the city of
Arlington.
This football-rich community is the perfect place for us to instill the XFL culture & DNA
into our players.
Now the fun part - we go to work.

#XFL
#Texas
#ArlingtonHQ
@XFL2023

Watch again
0:00 127.5K views
9:19 AM · Jul 25, 2022 · Twitter Media Studio
528 Retweets 91 Quote Tweets 3,796 Likes

November 5, 2021 – WWE, Inc. Form 8-K filing stating terms of Frank Riddick's hire as CFO / CAO (3 pages)

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K
CURRENT REPORT

Pursuant to Section 13 or 15 (d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): November 5, 2021

WORLD WRESTLING ENTERTAINMENT, INC.
(Exact name of registrant as specified in its charter)

Delaware 001-16131 04-2693383
(State or other jurisdiction of incorporation)

(Commission File Number) (IRS Employer Identification No.)

1241 East Main Street, Stamford, CT 06902
(Address of principal executive offices)
(Zip Code)

Registrant's telephone number, including area code: (203) 352-8600

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2.):
☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:
Title of each class
Trading Symbol(s)
Name of each exchange on which registered

Class A Common Stock, par value $0.01 per share WWE New York Stock Exchange

Indicate by check mark whether the registrant is an emerging growth company ad defined in Rule 405 of the Securities Act of 1933 (17 CFR 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR 240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

On November 5, 2021, World Wrestling Entertainment, Inc. (the "Company") issued a press release announcing the departure of Kristina Salen, the Company's Chief Financial Officer, from the Company effective that day. In addition, the Company announced that Frank A. Riddick III has been appointed to serve as the Company's Chief Financial Officer and Chief Administrative Officer, also effective November 5, 2021. On the same date, Mr. Riddick resigned from the Company's board of directors. Biographical and other information regarding Mr. Riddick, including his acting as Interim Chief Financial Officer of the Company during a portion of 2020, is included in the Company's proxy statement for its 2021 Annual Meeting of Stockholders, filed with the Securities and Exchange Commission on April 13, 2021 (the "Proxy Statement"), which is incorporated herein by reference.

Mr. Riddick entered into an employment agreement with the Company (the "Employment Agreement"), pursuant to which he agreed to serve as the Chief Financial Officer of the Company, effective November 5, 2021. The Employment Agreement provides that Mr. Riddick will receive an annual base salary of $850,000 and a one-time $1.0 million cash sign-on bonus payment, which is subject to certain repayment requirements. In addition, Mr. Riddick will be eligible to earn an annual discretionary performance cash bonus award with a target bonus thereunder of 70% of his base salary. Mr. Riddick also will be eligible to receive equity awards subject to and governed by the terms of the Company's 2016 Omnibus Incentive Plan (the "Incentive Plan"). His initial annual target incentive award will be in a target amount equal to 100% of his base salary. In connection with the appointment, Mr. Riddick received a sign-on inducement grant of restricted stock units valued at $5.0 million, which are subject to and governed by the terms of the Incentive Plan and the applicable award agreement, which provide for claw-back and recovery of vested amounts in certain circumstances. The restricted stock units will vest in equal installments over four years beginning on June 30, 2022. Mr. Riddick also will be eligible to participate in future equity award programs and other compensation and benefits plans and programs available to similarly situated executives.

Pursuant to the terms of the Employment Agreement, in the event the Company terminates his employment without "cause" (as defined in the Employment Agreement)

84

or he terminates his employment for "good reason" (as defined in the Employment Agreement), Mr. Riddick will be eligible to receive as severance (i) a payment in an amount equal to the sum of his base salary and annual bonus based on target performance for the year in which the termination occurs and (ii) a prorated portion of the annual bonus he would have otherwise earned for the year in which the termination occurs.

The foregoing description of the Employment Agreement is qualified in its entirety by reference to the complete text of the Employment Agreement, a copy of which is attached as Exhibit 10.1 to this Current Report on Form 8-K and incorporated herein by reference. A copy of the Company's press release is attached as Exhibit 99.1 to this Current Report on Form 8-K. Further information about the Company's executive compensation plans and programs, including the incentive Plan, is included in the Proxy Statement.

Mr. Riddick has no family relationships with any director or executive officer of the Company, and there are no arrangements or understandings with any person pursuant to which he was selected as an officer of the Company. In addition, there have been no transactions directly or indirectly involving Mr. Riddick that would be required to be disclosed pursuant to Item 404(a) of Regulation S-K under the Securities Exchange Act of 1934. Information about his compensation as the Company's Interim Chief Financial Officer during a portion of 2020 and as an independent director during the other parts of 2020 is included in the Proxy Statement.

Item 9.01. Financial Statements and Exhibits.

(d) Exhibits

10.1 Employment Agreement, dated November 3, 2021, between World Wrestling Entertainment, Inc. and Frank A. Riddick III.

99.1 Press Release dated November 5, 2021.

104 Cover Page Interactive Data File (embedded within the Inline XBRL document).

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WORLD WRESTLING ENTERTAINMENT, INC.

By: /s/ Samira Shah
Samira Shah
General Counsel and Corporate Secretary
Dated: November 5, 2021

June 8, 2022 – ESPN+ and ESPN Networks to Bring Every 2022 Matchup of the Canadian Football League to Fans in the United States (2 pages)

https://www.cfl.ca/2022/06/08/espn-networks-to-deliver-full-slate-of-2022-cfl-action/

Lily Blum, June 8, 2022

- Season kicks off on June 9 at 9 p.m. ET on ESPN+
- All 81 regular season games to be available on ESPN networks; ESPN+ to exclusively stream 61 of the games with the remaining 20 on either ESPN2 or ESPNEWS
- CFL Playoffs and the 109th Grey Cup will air on ESPN Networks in November

ESPN+ and ESPN Networks will exclusively air the Canadian Football League's (CFL) full 2022 schedule to fans in the United States. The 2022 CFL season will premiere on ESPN+ this Thursday, June 9 at 9 p.m. ET, when the Montreal Alouettes travel to Calgary to take on the Stampeders. Sixty-one of the League's 81 games will stream exclusively streamed on ESPN+ throughout the season.

From June through November, CFL games will take place on Thursdays, Fridays, Saturdays and Sundays, with the addition of four Monday games—all on holidays; one game on Independence Day (July 4), two games on Labor Day (September 5) and one game on Canadian Thanksgiving (October 10)—all available on either ESPN+, ESPN2 or ESPNEWS. Following playoff coverage, which will be announced at a later date, ESPN2 will wrap up the season on Sunday, November 20, with the 109th Grey Cup. ESPN will simulcast production from The Sports Network (TSN), Canada's leading sports network.

ESPN and the CFL's relationship began in 1980, when ESPN televised a game between the Toronto Argonauts and the Montreal Alouettes. This matchup was the rest live football telecast in ESPN's history. In 2019, ESPN and the CFL signed a multi-year agreement, making ESPN the sole CFL rights holder in the U.S.

The full 2022 CFL on ESPN schedule can be found here.

About ESPN+
ESPN+ is the industry-leading sports streaming service that offers fans in the U.S. thousands of live sports events, original programming not available on ESPN's linear TV or digital networks and exclusive editorial content from dozens of ESPN writers and reporters. Launched in April 2018, ESPN+ has grown to more than 22.3 million subscribers.

Fans sign up to ESPN+ for just $6.99 a month (or $69.99 per year) at ESPN.com, ESPNplus.com or on the ESPN App (mobile and connected devices). It is also available as part of The Disney Bundle that gives subscribers access to Disney+, ESPN+ and Hulu for $13.99/month (Hulu w/ads) or $19.99/month (Hulu w/o ads).

Subscribers to Hulu + Live TV also receive ESPN+ at no additional cost.

About the Canadian Football League
Built on a foundation of more than 110 years of football tradition and history, the Canadian Football League features nine teams, millions of fans and a commitment to service to the community, as well as, elite sport. To stay up to date with CFL news, visit CFL.ca.

Media Contact:
ESPN: Lily Blum, Lily.Blum@ESPN.com and @Lily_Blum96
CFL: Lucas Barrett, lbarrett@c.ca and @LucasBarrett9

August 31, 2022 – WWE, Inc. SEC Form 8-K filing giving details of Frank Riddick's terms promotion to President (7 pages)

UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 8-K
CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): August 31, 2022

World Wrestling Entertainment, Inc.
(Exact name of registrant as specified in its charter)

Delaware 001-16131 04-2693383
(State or other jurisdiction (Commission File Number) (IRS Employer of incorporation) Identification No.)

1241 East Main Street, Stamford, CT 06902
(Address of principal executive offices) (Zip code)

Registrant's telephone number, including area code: (203) 352-8600

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2.):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:
Title of each class Trading Symbol(s) Name of each exchange on which registered
Class A Common Stock, par value $0.01 per share WWE New York Stock Exchange
Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).
Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.

As previously disclosed, Vincent K. McMahon resigned from all positions held with the Company on July 22, 2022 (the "Effective Date"). Mr. McMahon remains a stockholder with a controlling interest. His roles as an executive officer since that date have been assumed among four individuals, each of whom was already an executive officer of the Company: Stephanie McMahon Levesque, Chairwoman and Co-CEO; Nick Khan, Co-CEO; Frank A. Riddick, III, Chief Financial Officer and Chief Administrative Officer; and Paul Levesque, Chief Content Officer.

Effective September 2, 2022, Mr. Riddick was promoted to President; he will continue in his role as Chief Financial Officer.

Due to these changes, the Company's Compensation and Human Capital Committee determined on August 31, 2022 that it is appropriate to provide certain enhancements to the compensation of Ms. McMahon and Messrs. Khan, Riddick and Levesque as described below:

1. Changes in Base Salary.
As of the Effective Date, (i) Ms. McMahon's annual base salary increased from $730,000 to $1.35 million. Ms. McMahon will continue to receive payments including, without limitation, the $750,000 guaranteed minimum under her booking agreement, as amended, which is listed as an exhibit (and incorporated by reference) to our Annual Report on Form 10-K/A filed with the SEC on August 16, 2022; (ii) Mr. Khan's annual base salary increased from $1.2 million to $1.35 million; (iii) Mr. Riddick's annual base salary increased from $850,000 to $950,000; and (iv) Mr. Levesque's annual base salary increased from $730,000 to $900,000. Mr. Levesque will continue to receive payments including, without limitation, the $1.0 million guaranteed minimum under his booking agreement, as amended, which is listed as an exhibit and incorporated by reference) to our Annual Report on Form 10-K/A filed with the SEC on August 16, 2022.

2. Changes in Annual Target Bonus Opportunity under the Company's 2016 Omnibus Incentive Plan.
The following annual target bonus opportunities (as a percentage of annual base salary) were established. As disclosed from time to time in our annual proxy statements, these are target opportunities only and actual bonuses paid may be above or below these amounts based on, among other factors, the Company's performance vis-à-vis performance metrics established by the Compensation and Human Capital Committee: (i) Ms. McMahon: 160%; (ii) Mr. Khan: 160%; (iii) Mr. Riddick: 125%; and (iv) Mr. Levesque: 100%. In respect of annual bonuses to be paid for 2022 to each of Ms.

McMahon, Mr. Khan, Mr. Riddick and Mr. Levesque, the percentage changes will be prorated from the Effective Date.

3. Future Annual Equity Grants under the Company's 2016 Omnibus Incentive Plan. While grants of equity remain at all times within the discretion of the Company's Compensation and Human Capital Committee, it is expected that annual grants beginning in 2023 shall have the following grant date target values, subject to performance metrics and vesting periods. The Company's current practice is to value grants at an average of the closing price of the Company's Class A Common Stock on the New York Stock Exchange over the thirty trading days immediately preceding the grant date: (i) Ms. McMahon: $3.575 million; (ii) Mr. Khan: $3.575 million; (iii) Mr. Riddick: $2.4 million; and (iv) Mr. Levesque: $1.6 million.

4. Special Equity Grants
In addition to the foregoing, Ms. McMahon will receive a one-time special equity grant of performance stock units ("PSUs") with a grant date target value (valued as described in Section 3 above) of $10 million on or about October 3, 2022. This grant will have a three-year performance measurement period ending September 30, 2025, at which time the PSUs, adjusted as a result of performance, would vest. 82.5% of the performance metrics for Ms. McMahon will be based on certain media rights agreements and consolidated revenue, and the remainder will be based on the Company attaining certain human capital and governance goals to be determined by the Compensation and Human Capital Committee. Similarly, Mr. Levesque will receive a one-time special equity grant of PSUs with a grant date target value of $8 million on or about October 3, 2022. This grant will also have a three-year performance measurement period ending September 30, 2025, at which time the PSUs, adjusted as a result of performance, would vest. 65.0% of the performance metrics for Mr. Levesque will be based on certain media rights agreements, and the remainder will be based on the attainment of certain milestones relating to talent development and creative matters to be determined by the Compensation and Human Capital Committee.

5. Severance Protection in the event of a Change in Control.
In order to achieve enhanced parity among senior executives and provide incentive to them to remain in their positions in the event that a Change in Control (as defined below) of the Company (no such change is currently contemplated) together with a Second Trigger (as defined below) the agreements between the Company and each of Ms. McMahon, and Messrs. Khan, Riddick and Levesque will be established (in the case of Ms. McMahon and Mr. Levesque) or amended (in the case of Messrs. Khan and Riddick) to include the following change in control severance terms:

(i) "Change in Control" will be defined as follows:
A "Change in Control" shall mean the occurrence of any of the following; provided, however, that "Change in Control" shall have any "Change in Control" or similar definition contained in Section 409A of the Internal Revenue Code in any instance in which amounts are paid under a compensation agreement as a result of a Change in Control and such amounts are treated as deferred compensation under Section 409A:

(a) The acquisition in one or more transactions, other than from the Company, by any individual, entity or group (within the meaning of Section 13(d)(3) or 14(d)(2) of the Exchange Act), other than the Company, a Company subsidiary or any employee benefit plan (or related trust) sponsored or maintained by the Company or a Company subsidiary, of beneficial ownership (within the meaning of Rule 13d-3 promulgated under the Securities and Exchange Act of 1934 as amended) of a number of Company securities aggregating 30% or more of the vote of all voting securities;

(b) Any change in the composition of the Board of Directors within a 24-month period that results in more than fifty percent (50%) of the independent members of the Board of Directors consisting of persons other than (i) those persons who were independent members of the Board of Directors at the beginning of such 24-month period and/or (ii) persons who were nominated for election as independent members of the Board of Directors at a time when more than fifty percent (50%) of the Board of Directors consisted of persons who were independent members of the Board of Directors at the beginning of such 24-month period; provided, however, that any person nominated for election by the Board of Directors, more than fifty percent (50%) of whom consisted of persons described in clause (i) and/or (ii), shall, for this purpose, be deemed to have been nominated by a Board of Directors composed of persons described in clause (i);

(c) The consummation (i.e., closing) of a reorganization, merger or consolidation involving the Company, unless, following such reorganization, merger or consolidation, all or substantially all of the individuals and entities who were the beneficial owners of the Company's common stock immediately prior to such reorganization, merger or consolidation, following such reorganization, merger or consolidation beneficially own, directly or indirectly, more than 70% of both the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities of the entity resulting from such reorganization, merger or consolidation in substantially the same proportion as their ownership of the Company's common stock and outstanding voting securities immediately prior to such reorganization, merger or consolidation;

(d) The consummation (i.e., closing) of a sale or other disposition of all or substantially all the assets of the Company, unless, following such sale or disposition, all or substantially all of the individuals and entities who were the beneficial owners of the Company's common stock immediately prior to such sale, beneficially own, directly or indirectly, more than 60% of both the then outstanding shares of common stock and the combined voting power of the then outstanding voting securities of the entity purchasing such assets in substantially the same proportion as their ownership of the Company's common stock and outstanding voting securities immediately prior to such sale or disposition;

(e) the consummation of any transaction described in in (a) or (c) above, following which Vincent K. McMahon and his family (as defined in Section 267(c)(4) of the Internal Revenue Code) retain beneficial ownership of voting securities of, as applicable, the Company, its successor or the ultimate parent corporation or other entity of the chain of

corporations or other entities which includes the Company or its successor, representing voting power that is less than that of any other individual, entity or group; or

(f) A complete liquidation or dissolution of the Company.
(ii) There will be a consistent "Second Trigger" across all executive officers' agreements which will include a termination of his or her employment by the Company without cause or a resignation by the executive officer for Good Reason (as defined below) on the date of or within the two (2) year period following a Change in Control.

"Good Reason" will be defined to include any of the following:
(a) a reduction in Base Salary and/or target compensation for the executive;

(b) a material change of title, authority, duties or responsibilities including, without limitation (i) in the case of either Ms. McMahon or Mr. Khan, ceasing to have the title and duties of chief executive officer or co-chief executive officer of the Company, (ii) in the case of Ms. McMahon, being the co-chief executive officer with anyone other than Mr. Khan, (iii) in the case of Mr. Khan, being the co-chief executive officer with anyone other than Ms. McMahon;

(c) an adverse change in the reporting structure applicable to the executive, which (i) in the case of either Ms. McMahon or Mr. Khan shall mean such executive is required to report to any person(s) other than the full Board of Directors and (ii) in the case of either Mr. Riddick or Mr. Levesque shall mean such executive is required to report to any person other than Ms. McMahon and/or Mr. Khan;

(d) a material breach by the Company or the successor of the terms and conditions of any employment or other compensation agreement with the executive;

(e) the failure to obtain an agreement from any successor to assume and agree to perform all equity and other compensatory agreements in the same manner and to the same extent as would be the case if no change had occurred (unless such assumption occurs by operation of law); or

(f) except with respect to Mr. Riddick, the Company's failure to nominate the executive for election to the Board of Directors and to use its best efforts to have the executive elected to the Board of Directors.

Notwithstanding the foregoing, in the event the executive asserts that one of the foregoing reasons exists for potential termination of employment, the executive shall first provide the Company written notice specifying the nature of the reason and the Company will have at least thirty (30) days to cure or remedy the situation. If the executive has not terminated employment within ninety (90) days after the occurrence of such Good Reason situation or event that has not been cured or remedied by the Company, the executive will be deemed to have waived the right to terminate on the basis of Good Reason with respect to the situation or event giving rise to Good Reason.

(iii) In the event of a Change in Control and the occurrence of a Second Trigger event (an "Eligibility Event"), the executive officers will be entitled to the following payments and benefits:

(a) Ms. McMahon: (1) two times her then-current base salary; (2) two times the target bonus opportunity for the year in which the Eligibility Event occurs; (3) an annual bonus based on actual performance for the year of the Eligibility Event and prorated for the portion of the calendar year that has lapsed prior to the Eligibility Event; (4) full vesting of all equity grants outstanding at such time, including, without limitation, the special grant described above, and with performance awards vesting (x) at target level of achievement for awards for which performance is incomplete as of the date of the Eligibility Event and (y) based on actual performance for awards for which performance has been completed as of the date of the Eligibility Event; and (5) continued health benefits for twenty-four months.

(b) Mr. Khan: (1) two times his then-current annual base salary; (2) two times the target bonus opportunity for the year in which the Eligibility Event occurs; (3) an annual bonus based on actual performance for the year of the Eligibility Event and prorated for the portion of the calendar year that has lapsed prior to the Eligibility Event; (4) full vesting of all equity grants outstanding at such time, including, without limitation, all special grants previously made to Mr. Khan, and with performance awards vesting (x) at target level of achievement for awards for which performance is incomplete as of the date of the Eligibility Event and (y) based on actual performance for awards for which performance has been completed as of the date of the Eligibility Event; and (5) continued health benefits for twenty-four months.

(c) Mr. Riddick: (1) one and a half times his then-current annual base salary; (2) one and a half times the target bonus opportunity for the year in which the Eligibility Event occurs; (3) an annual bonus based on actual performance for the year of the Eligibility Event and prorated for the portion of the calendar year that has lapsed prior to the Eligibility Event; (4) full vesting of all equity grants outstanding at such time, including, without limitation, all special grants previously made to Mr. Riddick, and with performance awards vesting (x) at target level of achievement for awards for which performance is incomplete as of the date of the Eligibility Event and (y) based on actual performance for awards for which performance has been completed as of the date of the Eligibility Event; and (5) continued health benefits for eighteen months.

(d) Mr. Levesque: (1) one and a half times his then-current annual salary; (2) one and a half times the target bonus opportunity for the year in which the Eligibility Event occurs; (3) an annual bonus based on actual performance for the year of the Eligibility Event and prorated for the portion of the calendar year that has lapsed prior to the Eligibility Event; (4) full vesting of all equity grants outstanding at such time, including without limitation, the special grant described above, and with performance awards vesting (x) at target level of achievement for awards for which performance is incomplete as of the date of the Eligibility Event and (y) based on actual performance for awards for which

performance has been completed as of the date of the Eligibility Event; and (5) continued health benefits for eighteen months.

These enhancements are in addition to, and not in lieu of, benefits currently included in agreements with the executive officers. In certain instances, the enhancements described above are already in agreements with Messrs. Khan and Riddick, and in those instances, there will not be a duplication of benefits.

The foregoing description does not purport to be complete and is qualified in its entirety by reference to the full text of the agreements contemplated to be entered into, which will be filed as exhibits to the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2022 and is incorporated by reference herein.

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

WORLD WRESTLING ENTERTAINMENT, INC.
Dated: September 2, 2022
By: /s/ Suzette Ramirez-Carr
Suzette Ramirez-Carr
Executive Vice President, Chief Human Resources Officer

https://www.sportsbusinessjournal.com/Journal/Issues/2023/02/06/Technology/tempus-ex-machina.aspx

Inside Tempus Ex Machina as the company reveals its technology and significant impact on the NFL

Born out of the AAF—with Charlie Ebersol again as CEO—Tempus Ex helps the NFL sync all its video and data at the point of creation, completely transforming the league's video collection process.

BY JOE LEMIRE, 2-9-2023

Tempus Ex is a league-wide partner of the NFL, and its FusionFeed technology is installed at every stadium. It wasn't until now that the intricacies of how the technology works was revealed.

This story is the first of two on Tempus Ex Machina. This piece explains, for the first time, how the technology works and how closely tied the company is to the NFL. Part two focuses on its leadership.

Tempus Ex Machina first entered the public consciousness via press release on Sept. 8, 2021. The understated news item was notable for a few reasons. There was minimal detail about what the company did beyond vague references to technology, data, machine learning and the "sports consumption experience."

The release acknowledged funding from heavy-hitting investment firms Andreessen Horowitz, General Catalyst, Silver Lake, Endeavor, and Will Ventures. This announcement was for a Series B round despite no prior record of a Series A, which was mentioned only in the final sentence.

There was a quote from NFL EVP Troy Vincent, a courtesy not often granted by the league, suggesting deep ties with this heretofore anonymous startup. Former Arizona Cardinals receiver Larry Fitzgerald Jr. joined the Tempus Ex Machina board. There was no mention of any of its executives, although a quick internet search discerned that the co-founder driving the tech startup was Alliance of American Football CTO Erik Schwartz.

Spring football was its public-facing product but, as AAF executives acknowledged, only part of their motivation. The other was to construct a modern and coherent technology stack that would make the transmission and use of data more efficient, useful and potentially lucrative.

While the Alliance developed a popular gaming app — it ranked No. 1 in sports in the Apple and Google Play stores upon its release — there were pain points beyond the league's death knell of investment drying up. But the AAF executives learned from the experience, buoyed by recent hardware advances to maximize processor speed and

95

efficiency, and they turned to a new coding language and started from scratch to build what is now Tempus Ex Machina.

"We're like the operating system for sports," Schwartz said.

The core IP of Tempus Ex is that the system syncs all video and data at the point of creation. Those timestamps persist, no matter how and where the bits get used downstream through its FusionFeed, whether it's to power the NFL's football operations dashboard, generate new content for a Pepsi sponsorship, help Pac-12 football players monetize their highlights or help medical personnel triage sources of on-field injury.

"I love the product," Vincent told SBJ, calling the technology a "godsend" that is saving his department 234 hours per week in reviewing and tagging plays. When college conferences visit the league's command center to discuss best practices, Vincent said he tells them, "I would not do anything without moving forward with Tempus, just as a level setter."

Those are existing activations, but the potential for further innovation is limitless. A partnership with Unity, the leading developer of mobile games, portends one area of exploration. The analogy that Tempus Ex executives regularly cite is of Google Maps, whose API is a wildly profitable business underpinning the ride-sharing industry and companies like Yelp and Airbnb.

"That lit up light bulbs for people when they're like, 'Yeah, Google Maps is a core product that Uber, Postmates and all these other companies wouldn't exist without,'" Tempus Ex COO Annie Gerhart said.

The sports industry is similarly built on a licensing business model, and a platform like Tempus Ex creates utility by reducing the barrier for entry.

"We shouldn't be the ones building every new product," said Sidhant Rao, Tempus Ex's head of revenue and partnerships. "The business is successful if we find these strategic partners or developers anywhere in the world that want to build the next generation sports app."

From the Alliance to the League

Just as the company's core technology itself has been clouded in mystery until now, so too has the identity of its leader. Subsequent news releases typically quoted co-founders Schwartz, the company president, or Gerhart. A review of patents assigned to Tempus Ex Machina, however, included a recognizable name among the series of inventors: "Charles D. Ebersol."

Indeed, the CEO of the Alliance is now the CEO of Tempus Ex, with the new company having made a concerted effort to downplay the identity of its leader in its nascent days.

"This company stands on the merits of its technology," Charlie Ebersol said during several recent conversations, his first such professional interviews in years. "For the last three years, me being a public face of a company would have been a distraction, and it would have gotten in the way of the team building what they needed to build."

Buried within the mounds of litigation still trailing the collapse of the AAF was a conspicuous note tucked into a complaint made in a West Texas bankruptcy court. This detail, first reported by The Athletic and later confirmed by SBJ, stated that in Jan. 2019—before the Alliance had played a single game—the NFL had signed a binding term sheet to acquire a 15% of a technology company spun out from the AAF.

"The NFL was much more aware of what was going on inside the AAF than I think was generally understood," Schwartz said, adding that after the Alliance ended, the NFL had "immediate interest" and signed an R&D contract "basically right away."

A condition of the AAF's term sheet with the NFL was a stipulation that Alliance engineers could examine the NFL's tech stack and build an exact replica. What they found was a series of patchwork fixes and add-ons that solved immediate problems but suffered from being too convoluted. There was never any incentive to rework the whole ecosystem to reconcile all the latest advances.

"The technology stack around sports is, in a lot of cases, [assembled from] hacks that were built to solve a specific problem," Schwartz said. "And then that became the canonical way to do it. And then they keep doing it that way for 15 years."

"One, they're siloed," Ebersol said of current NFL vendors and partners. "And two, they're very focused on the data as licensable content, which is understandable—the entire sports business is a licensing business. So if you take that model, and you play to its logical conclusion, what happens—and what we discovered at the AAF—is this is what your tech stack ends up looking like."

At this point, he clicked his laptop and summoned the next page of the deck, the one the Tempus Ex team internally refers to as "the Chaos Slide." It's a labyrinthine diagram of workflows and data transmission, or else it's an overzealous English student's attempt at grammatically diagramming a sentence from William Faulkner.

The AAF brought a truck to each game stuffed so full that it resembled the "Ninja Turtles van," Ebersol said wryly. There also came a realization that the focus of the Alliance's tech efforts was misplaced. "It's like we were looking at a sapling in a forest of sequoias," he said. "[We needed to] back off and get a better picture of where the opportunity is and stop trying to be the solution."

MGM Resorts had invested in the Alliance for the gaming potential of its technology and held a lien on the tech after the league folded, but Tempus Ex represents a new evolution built from scratch. MGM has invested in this new technology as well, Ebersol said.

Prior to the 2021 NFL season, Tempus Ex installed servers in every stadium, ran new fiber in some and placed three 8K cameras around the fields: two high in the end zones and one high at the 50 yard-line. Those high-resolution feeds, the FusionCams, provide expansive coverage, filling in the gaps between broadcast cameras. Latency is improved but, Schwartz noted, even more important is that latency is known.

"The reason the company's called Tempus Ex Machina—'time from the machine'—is because we developed a sync system that allows us to sync everything at creation," Ebersol said.

The goal is to take all the cameras, all the live stats and all the live tracking data and marry them in a way that enables feeds that are better catered to viewers' interests. Think ESPN's ManningCast or Amazon's Prime Vision, but with even greater variety. Further on the horizon are truly personalized streams; a fan can input his or her fantasy roster and have those players highlighted anytime on they are on the field, for example.

"Clearly, the broadcasters understand the idea that segmenting the broadcast to their different viewer cohorts is powerful for them," Schwartz said. "What we're doing allows them to scale that as narrow as they want. You can literally build a broadcast at the individual level."

The natural starting point was American football, but the system is largely "input agnostic," Gerhart said, and is in development for use cases in other sports.

"We're generating new businesses," Ebersol said. "We're creating the Uber of sports that then has to become a licensable partner of the league."

The NFL Buys In

Vincent took over as the NFL's head of football operations in March 2014. Part of his charge is to scour the field to spot rules infractions, such as improper equipment or illicit use of video. He reviews plays that can be shared to teach officials, coaches, broadcasters.

For years, that was a manual process. A staff member would shadow him and jot down plays to review and clip later. Vincent would make other notations himself and later find himself flipping through page after page in stacks of notebooks, all a colorful patchwork of highlights and sticky notes.

"Just completely dinosaur," Vincent said of the process, "but that was the world that we all lived in just a few years ago."

When Tempus Ex was developing its current system, Ebersol asked Vincent, "What are your challenges?" An engineer shadowed the football ops boss for six weeks, listening to feedback and tracking all his actions down to the keystroke.

"My challenges are game video: being able to sync it, aggregate it, find it real time, tag it, note it, and so on and so forth," Vincent said. "We had no ability to do it."

The dashboard that Tempus Ex built — "interactive aggregation," Vincent calls it now — solved for all that. The New York command center receives video of every play with about four-to-eight second latency, inclusive of every camera in every venue. Even the league office used to be beholden to what broadcasters showed on TV, but now every video feed is ingested.

Vincent can pin certain angles, add notes to others and quickly create collections of plays of varying specificity: every roughing the passer penalty, every replay review of a possible reception or even multiple layers of filters, such as every touchdown pass David Carr threw to the left of the field.

The 8K FusionCams act as all-seeing eyes that capture previously occluded details. When there are field incursions by wayward fans, the NFL used to spend days piecing together various video angles and syncing them to identify how the security lapse happened. Vincent said it commonly took until Thursday to complete the forensic video review; now it's a quick review and immediately shared with security.

"When there is no dedicated angle that allows a user to isolate an incident that is not picked up, say, by way of broadcast angles in real time, I can do it with the FusionCam," Vincent said, at which point he whispered into the phone for effect. "It's amazing."

And its support from the NFL extends to the very top.

"The commissioner is very, very invested in making sure that we are innovative in all that we do," NFL chief administrative officer Dasha Smith said, who directly reports to Roger Goodell, "and certainly he views Tempus Ex as being a part of that and how we can continue to innovate and provide new ways in which our fans can experience the game."

https://www.sportsbusinessjournal.com/Journal/Issues/2023/02/06/Technology/tempus-ex-machina-charlie-ebersol.aspx?publicationSource=SBJ

Behind the curtains at Tempus Ex Machina: Up close with the leadership team that's developing the cutting-edge technology

Following the abrupt collapse of AAF, Charlie Ebersol and his executive team continued on with building out the technology that would later become the core IP of Tempus Ex Machina.

BY JOE LEMIRE, 2-8-2023

Erik Schwartz (pictured far right) and Annie Gerhart (center), part of the core founding team at the Alliance, joined Charlie Ebersol in creating Tempus Ex Machina following the AAF's downfall.

This story is the final of a two-part series on Tempus Ex Machina...



**UNITED STATES POSTAL SERVICE**

**PRIORITY MAIL EXPRESS** Retail

U.S. POSTAGE PAID
PME 1-Day
ARLINGTON, TX 76012
SEP 11, 2023

$31.85

RDC 07

MAILING ENVELOPE
FOR DOMESTIC AND INTERNATIONAL USE

EMS

FROM:
David Adrian Smith
3917 Club way Ln
Farmers Branch, TX
75244

TO:
District Clerk
Northern District of Texas
1100 Commerce St, Rm 1452
Dallas, TX
75242

PEEL FROM THIS CORNER

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

RS10000132900

EP13C July 2022
OD: 15 x 11.625

RECEIVED
SEP 13 2023

UNITED STATES POSTAL SERVICE